UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                               *
                               *
ESTATE OF MICHELE M.           *
WALKER, et al.,                *
                               *
          Plaintiffs,          *
                               *
     v.                        *    No. 11-CV-421-PB
                               *
STATE OF NEW HAMPSHIRE,        *
et al.,                        *
                               *
          Defendants.          *
                               *
                               *
* * * * * * * * * * * * * * * *
```

DEPOSITION OF CHARLES WALKER

Deposition taken by counsel at the Law

Office of Leslie H. Johnson, PLLC, 46

Holderness Road, Sandwich, New Hampshire,

on Monday, June 11, 2012, commencing at

9:30 a.m.

BRAGAN REPORTING ASSOC., INC.
(603) 669-7922

Page 2

```
                    INDEX

WITNESS: Charles Walker

EXAMINATION:                    Page
     By Ms. Dempsey              4
     By Ms. Johnson            267
     By Ms. Dempsey            272

EXHIBITS FOR IDENTIFICATION:

Walker    Description              Page

  1    2/4/08 E-mail                104

  2    NH Judicial Branch Employee  112
       Performance Report
  3    NH Commission for Human Rights 113
       Amended Charge of Discrimination

  4    Copy of Steno Book cover and  210
       8 pages of handwritten notes
  5    11/9/09 Letter to Paula Hurley 219
  6    24 pages of typed notes       232
  7    8/13/09 one page of handwritten 261
       notes

  8    Handwritten note and dictionary 263
       page containing definition of
       "deceive"

       (Original exhibits retained by Ms. Dempsey.)
```

Page 3

APPEARANCES:
For the Plaintiff: LAW OFFICE OF LESLIE
        H. JOHNSON, PLLC
        By: Leslie H. Johnson, Esq.
        P.O. Box 265
        Center Sandwich, NH 03227
        (603) 284-6600
        leslie@lesliejohnsonlaw.com
For the Defendants: STATE OF NEW HAMPSHIRE
        Department of Justice
        Office of the Attorney General
        By: Mary Ann Dempsey, Esq.
          Lisa M. English, Esq.
        33 Capitol Street
        Concord, NH 03301
        (603) 271-3675
        maryann.dempsey@doj.nh.gov
        lisa.english@doj.nh.gov

Court Reporter: Celeste A. Quimby, NH LCR No. 17

               STIPULATIONS

    It is agreed that the deposition shall be taken
in the first instance in stenotype and when transcribed
may be used for all purposes for which depositions are
competent under the Federal Rules of Civil Procedure.
    Notice, filing, caption and all other formalities
are waived. All objections except as to form are
reserved and may be taken in court at time of trial.
    It is further agreed that if the deposition is
not signed within thirty (30) days after submission to
counsel, the signature of the deponent is waived.

Page 4

                 CHARLES WALKER
         having been duly sworn by Ms. Dempsey,
         was deposed and testified as follows:
                   EXAMINATION
BY MS. DEMPSEY:
    Q. Can you state your full name for the record?
You can put your hand down.
    A. Charles E. Walker.
    Q. E. Walker?
    A. E. Walker, W A L K E R.
    Q. Mr. Walker, have you ever had your deposition
taken before like we're going to do today?
    A. I'm not sure what you're going to be doing
today, but I've given a deposition to the attorney.
    Q. Okay. You've spoken to your attorney?
    A. Yes.
    Q. And I don't want to know anything that you
talked to your attorney about.
    A. Correct.
    Q. Have you ever given testimony under oath
with -- in either court or with a court stenographer
like we have today?
    A. No.

Page 5

    Q. Okay. Let me go over some of the basic
ground rules to hopefully make the day go smoother.
I'm going to ask you a series of questions. Sometimes
you're going to know exactly what I'm asking before I
even finish. If you can let me finish my question, I
promise to let you finish your answer, and that way
we're not talking over each other, okay?
    A. Yes.
    Q. Because everything is being taken down by the
stenographer, it doesn't pick up um-hums or shakes of
the head. So I'll prompt you for a verbal response if
I need to do so, okay?
    A. Yes.
    Q. If you don't understand something that I ask
you, sir, let me know. I'm not trying to trick you.
I'm happy to explain a question or ask you a different
question, okay?
    A. Okay.
    Q. If you do answer a question, I'm going to
assume you understood it. Fair enough?
    A. Fair enough.
    Q. Okay. I expect this deposition to go most of
the day. We'll take a break for lunch. But if at any

Page 58

1  Q. BY MS. DEMPSEY: Is that correct?
2  A. That's my gut feeling on that, yes.
3  Q. Okay.
4  A. It's all gut feeling on that. I have nothing
5  to substantiate that. I can't put my finger on
6  anything. I can't pick up a piece of paper or --
7  Q. Brenda never told you she was jealous?
8  A. Correct.
9  Q. Okay.
10 A. It's just --
11 Q. You were friends with her for a period of
12 time, correct?
13 A. Oh, yeah. We were always friends, yes.
14 Q. When did you notice that change? When did
15 you notice this jealousy that you're testifying about?
16 A. I'm not too sure if I ever really caught on
17 until after the fact. I think it was after all of this
18 that I -- hindsight 20/20, I think that's when I
19 started picking up on that.
20 Q. Brenda never did anything to give you that
21 impression at the time?
22 A. I don't believe so.
23 Q. Okay.

Page 59

1  A. If she did, I certainly wasn't picking up on
2  it.
3  Q. Okay. How many bailiffs worked in Littleton
4  during the 2007/2008 time frame?
5  A. What time frame?
6  Q. The 2007/2008.
7  A. I can't -- besides myself, right?
8  Q. Well, you stopped working in around
9  February 2008, correct?
10 A. That is correct.
11 Q. Okay. So the year before, how many bailiffs
12 would there be there in a given day?
13 A. Primarily me, unless it was a court date.
14 Then there would be one other.
15 Q. Okay.
16 A. Two others I could think of. And then
17 outside of those that they had -- oh, there might have
18 been three. Outside of those -- well, the ones that
19 worked with me were, you know, strictly court dates.
20 Q. Okay. And who would work with you?
21 A. I have -- let's see. There was Robert
22 Holmes. He works at the Lancaster court now.
23 Q. Okay. And who else?

Page 60

1  A. Russ Cumbee, C U M B E E. He works at the
2  sheriff's -- as the court security officer at the
3  Hanover -- or Haverhill. Haverhill. I'm sorry.
4  Q. That's okay. Would the bailiffs go into the
5  clerk's office to hang out?
6  A. Well, they would go in for business, whatever
7  the case may be, yes.
8  Q. Would anybody else go in there to mingle and
9  chitchat?
10 A. Well, there was a third bailiff. I didn't
11 mention that one, and --
12 Q. Stan? Was that the third bailiff?
13 A. Stan?
14 Q. Stan Dauphine?
15 A. Oh, he was after me.
16 Q. Okay.
17 A. Oh, yeah, I was wondering what you meant
18 there. I know who you mean. No, he was after me. He
19 used to be a -- he used to be a cop too. He had some
20 anger management issues big time.
21 Q. This third bailiff that you're talking about?
22 A. Yeah.
23 Q. Okay. You're just having trouble remembering

Page 61

1  his name?
2  A. The other one I got to put on the list.
3  Q. That's okay. Would the public defenders go
4  in to talk to the clerk's office? Would they actually
5  go into the clerk's office?
6  A. I don't believe so.
7  Q. Okay. How about the judges? When the judges
8  were there, would they go into the clerk's office and
9  talk to the staff?
10 A. Well, the judge is part of the court. He
11 is --
12 Q. Yeah. The clerk's office where Michele,
13 Brenda and Lisa were located, that room, would the
14 judges go in and talk to the staff there?
15 A. Well, Cyr is a man of very few words. The
16 only time he went in and talked was business related
17 that I could recall. I would say he was not --
18 Q. How long -- I'm sorry.
19 A. -- socializing too much that I'm aware of.
20 Q. I promised to let you finish your answer.
21 A. No, no, no, I'm finished. That's all right.
22 Q. How about maintenance folks? Would
23 maintenance folks go in there and talk to the staff?

BRAGAN REPORTING ASSOC., INC.
(603) 669-7922

Page 62

1   A.  If they saw them in there, they'd probably --
2   you know, they -- they're generally working when
3   they --
4   Q.  Right.  But at some point they talked to say
5   hello, how are you?
6   A.  Oh, yeah, just, you know, friendly
7   conversation, yeah.
8   Q.  Who was the maintenance staff at that time;
9   do you know?
10  A.  Don Stevens and George Ahearn, A H E A R N, I
11  believe.
12  Q.  Were you ever present in the clerk's office
13  when Michele Walker made a sexual joke?
14  A.  She never made a sexual joke that I'm aware
15  of.
16  Q.  Never while you were present?
17  A.  Never.  I don't recall any.
18  Q.  Do you know if Michele informed court staff
19  that she could have Trooper Cohen anytime she wanted
20  him?
21  A.  Not at all.
22  Q.  Were you ever present when Michelle Brown
23  made a sexual joke in the clerk's office?

Page 63

1   A.  No.
2   Q.  Were you ever present when Lynn Gilman made a
3   sexual joke in the clerk's office?
4   A.  No.
5   Q.  Have you been in touch with Tracy Ash since
6   Michele died?
7   A.  I've seen her at the bank a few times.
8   Q.  Is she a friend of yours?
9   A.  I guess, but we don't socialize.  Not
10  socially I guess.
11  Q.  Was Michele friends with her?
12  A.  Yes, but not socially.  Many moons ago they
13  were, but --
14  Q.  Besides Lisa Towle, did Michele have people
15  at the court she did not get along with?
16  A.  You mean Michele?
17  Q.  Your Michele, Michele Walker.
18  A.  Besides Lisa?
19  Q.  Exactly.
20  A.  I think she got along with everybody.
21  Q.  Do you know Court Officer Jim Pouliot?
22  A.  Doesn't ring a bell.
23  Q.  Okay.  Do you know if your wife got along

Page 64

1   with Officer Jim Pouliot?
2   A.  I don't know.  He was either -- maybe I know
3   him but not by the name.  I don't know.
4   Q.  That's okay.  The name is not familiar to you
5   and --
6   A.  Yeah.  Okay, yeah.
7   Q.  And you're not aware of your wife having
8   any --
9   A.  Oh, Jim Pouliot.
10  Q.  Oh, I'm sorry.  Am I saying it wrong?
11  A.  Yeah.
12  Q.  I'm sorry.
13  A.  Jim Pouliot.  He's the one I was trying to
14  think of.
15  Q.  The third bailiff?
16  A.  He's the one that had the anger issues and
17  everything else.
18  Q.  Do you know if Michele got along with Mr.
19  Pouliot?
20  A.  Yeah, they got along.  Yeah.
21  Q.  No issues between them?
22  A.  I think at one point, and I hate to -- Jim
23  had an issue with her for something.  I forget what it

Page 65

1   was.  He cornered her.  As a matter of fact, I think --
2   the best I can recollect, I think Don Stevens, the
3   janitor, was out in the hallway and heard it and kind
4   of stuck around, because it got a little heated, and he
5   got heated with her.
6   Q.  Was this during the time that you were dating
7   Michele?
8   A.  I don't recall.  I don't recall.
9   Q.  But you have no recollection about what that
10  controversy was about?
11  A.  Not offhand, no.
12  Q.  Did you try to find out at the time what that
13  controversy was about?
14  A.  No.  Michele told me, but I just don't -- she
15  told me what had happened, this and that.  She had got
16  frightened.  If I think of it, I'll tell you, but I
17  can't think of this offhand.
18  Q.  She was frightened by her encounter with Jim?
19  A.  Yeah.  Oh, yeah, he -- he got -- I want to
20  say got a little verbal with her.
21  Q.  Did she report that to anybody?
22  A.  I don't know that she did.
23  Q.  Did you report that when she told you that

## Page 90

1  Q. Okay. And what type of complaints were you
2  made aware of? Sorry.
3  A. No, I'm sorry. I don't know the time frames.
4  One was -- it's kind of a screwy thing. We were paid,
5  you know, very minimal to be in court. For argument's
6  sake, I don't remember exactly, like 8 to 9 -- 8 to 4
7  or something like that. We were allowed overtime, so
8  on, so forth, this and that.
9     One time a young lady came in on a
10 restraining order issue. And it was getting around
11 4:00, and she was in the lobby there. I locked that
12 door and told her when you go, just shut the door.
13    I told Lisa that I was going to be going.
14 The court was closed. The doors were locked. And that
15 complaint came through to my supervisor.
16    There was another time --
17 Q. So was that a complaint about you leaving
18 work while there was somebody still in the courthouse?
19 A. Yeah, yes.
20 Q. And did you leave with Michele Walker that
21 day?
22 A. No, I just left by myself.
23 Q. Sure.

## Page 91

1  A. Probably not the best decision I made, but I
2  secured everything down as best I could.
3     MS. DEMPSEY: Do you want to hold on just one
4  second. We've been going about two hours. Do you want
5  to break?
6     MS. JOHNSON: Yeah, let's take five or
7  ten minutes.
8     (Recess taken.)
9  Q. BY MS. DEMPSEY: Before the break, Mr.
10 Walker, we talked about one complaint that you learned
11 about your work as a security officer, which was
12 leaving somebody in the court and then leaving for the
13 day, and you were about to explain to me another
14 complaint you were made aware of. What was that, sir?
15 A. I forgot.
16 Q. You forgot?
17 A. I know there were -- I can't remember.
18 Q. Who --
19 A. The --
20 Q. I'm sorry.
21 A. No, go ahead.
22 Q. Who was your direct supervisor?
23 A. Jason Jordanhazy it's pronounced.

## Page 92

1  Q. Okay. Prior to the meeting when they
2  discussed the fraternization policy with you, prior to
3  that had you ever met with Jason for any concerns about
4  your work?
5  A. Probably that one I mentioned.
6  Q. Okay. Any other times that you can recall?
7  A. I know Jason come up a few times to talk to
8  me, but I can't remember exactly. Just that he used to
9  annoy the hell out of me. He just couldn't walk down
10 the hall without saying something.
11 Q. During the period of time that you worked at
12 the Littleton District Court, did you ever personally
13 witness your wife being sexually harassed?
14 A. No.
15 Q. During the time that you worked at the
16 Littleton District Court, did you ever personally
17 witness your wife being in fear for her safety?
18 A. No.
19 Q. Did you ever observe Lisa Towle act
20 inappropriately to your wife?
21 A. No.
22 Q. And you understand I'm including the entire
23 time that you worked at the court system?

## Page 93

1  A. Correct.
2  Q. You never made any personal observations?
3  A. Correct.
4  Q. Regardless of when you were dating versus
5  married to your wife?
6  A. Yeah, I don't recall.
7  Q. Okay. Do you know Pat Keniston?
8  A. Yes.
9  Q. And who is Pat?
10 A. She filled in to help out on some court dates
11 or days or whatever the case may be.
12 Q. Was Michele Walker friends with Pat?
13 A. As far as I know.
14 Q. Do you know if Pat was present during any
15 improper sexual communications?
16 A. I'm not aware of it.
17 Q. Have you ever spoken with Pat about how she
18 believed your wife treated Lisa Towle?
19 A. I never spoke to Pat about anything like
20 that.
21 Q. Did you ever observe Michele Walker treat
22 Lisa Towle inappropriately?
23 A. No.

Page 94

1  Q. Did anybody ever talk to you about that; tell
2  you that Michele did not treat Lisa well?
3  A. No.
4  Q. Do you know Joe McComiskey? Am I saying that
5  right? I suppose it only depends if you know him.
6  A. Joe --
7  Q. Caminsky? Comiskey?
8  A. I don't know that you're saying it right, but
9  it's --
10  Q. You potentially know who I'm talking about?
11  A. I'm not sure.
12  Q. Do you know a Joe who would have been at the
13  courthouse?
14  A. I can't say offhand. I don't know that
15  you're saying the name right.
16  Q. That could be completely true.
17  A. Joe? I'm pretty sure I do, but I can't make
18  the connection.
19  Q. When did you last work at the Littleton
20  District Court?
21  A. February 22nd of '08.
22  Q. Prior to that date, you had a meeting with
23  Mr. Jordanhazy?

Page 95

1  A. I guess.
2  Q. Okay. Did you meet with Mr. Jordanhazy?
3  A. About what?
4  Q. Well, let me ask you, did you have a meeting
5  with Mr. Jordanhazy, Don Goodnow, and Kim France at any
6  time?
7  A. Yes.
8  Q. Okay. When did that meeting take place?
9  A. I'm going to guess in '08, in the beginning
10  of '08, at Plymouth District Court.
11  Q. And what -- can you tell me about that
12  meeting, please?
13  A. Basically I was supposed to go down there and
14  meet with Jason and he was going to explain the
15  fraternization policy to me.
16  Q. Did he tell you beforehand that you were
17  having a meeting to discuss the fraternization policy?
18  A. He and I were, yes.
19  Q. Okay. And what did he tell you beforehand?
20  A. That he and I could -- would meet down there,
21  designate a time and place or whatever, just to go over
22  the fraternization policy with me.
23  Q. Okay. And did you talk to Michele Walker

Page 96

1  before you went to that meeting?
2  A. I believe so. I probably did tell her.
3  Q. Did you review the fraternization policy
4  before you went to that meeting?
5  A. Did I review it?
6  Q. Right.
7  A. No.
8  Q. Okay. What happened at the meeting itself?
9  A. Well, I got there. Jason came downstairs,
10  and he said Don Goodnow was there and Kim France was
11  there and -- which kind of took me by surprise, off
12  guard, whatever the case may be. So I decided to go up
13  and meet with them anyhow.
14  Q. Okay. And what happened during the meeting?
15  A. They -- well, I went to record it, and Don
16  Goodnow questioned why and this and that. So he talked
17  to me, this and that, and I decided not to record it.
18  Q. And what happened during the meeting? What
19  did they tell you?
20  A. Well, they didn't really go over the
21  fraternization policy as I had expected. It just kind
22  of felt like I was being ganged up on and -- with the
23  three of them on me. And I couldn't understand where

Page 97

1  the fraternization applied to me when -- the way that
2  it was brought to me. I strongly felt that, well, I
3  was being singled out. Michele and I were definitely
4  being singled out. Because a number of other courts
5  has husband and wife clerk, judge. There's another one
6  that has -- the husband's I think a bailiff or whatever
7  the hell he is, and she's on the court staff and this
8  and that. Nobody else is getting talked about, just
9  me, just Michele. And that to me is dead wrong. I
10  don't think that's right. I mean --
11  Q. Who said --
12  A. And I mentioned that and they -- at the
13  meeting I said, well, what about the others?
14      And Kim France yelled at me and said it's
15  none of your damn business. Well, she didn't say damn
16  I don't think, but she said none of your business. She
17  yelled at me. I said okay.
18  Q. I'm trying to understand, sir, what
19  specifically did the court staff tell you during that
20  meeting? What did they say to you?
21  A. Oh, cripe, I don't recall. Well, there was
22  one, I think Don Goodnow asked me who was my immediate
23  supervisor, who do I respond to, and I recalled saying

Page 98

1  that it was Michele, that I worked for her. But I
2  realized -- after I said it, but I realized Jason is my
3  immediate supervisor. But he's not there. Michele is
4  there. So I was asked. That's pretty much what I was
5  implying at that time.
6      Q.  She was the person at the court that you
7  would take instruction from?
8      A.  I took -- I took the instruction from
9  Michele. I always did.
10     Q.  Okay.
11     A.  Before and after.
12     Q.  At that meeting were you told that -- either
13 you or Michele that you couldn't -- were you told that
14 you could not work together in the same courthouse?
15     A.  What about that?
16     Q.  At that meeting the beginning of '08, did
17 they tell you that you couldn't work in the same
18 courthouse as Michele?
19     A.  They could have. I don't remember.
20     Q.  You don't remember anything that was
21 discussed in that meeting?
22     A.  Not a whole lot. I remember some things,
23 like I just told you, but not everything.

Page 99

1      Q.  Did you take notes after that meeting?
2      A.  No. I don't know. I don't know if I did or
3  not. I mean, I was -- you know, I'm leaving anyhow,
4  and I couldn't see what the urgency of this whole thing
5  was when I'm -- I was just leaving the court system
6  right after -- prior to us getting married, because I
7  didn't think that was such a good idea anyhow, not that
8  we affected anything, but --
9      Q.  You were already planning to leave?
10     A.  Yeah.
11     Q.  And why was that? Because you didn't think
12 you should work together?
13     A.  Because we were married. We were going to be
14 married. But yet the other courts it's okay, but I
15 just -- that's how I felt about it.
16     Q.  You thought there was something inappropriate
17 about you working together?
18     A.  I didn't think it was inappropriate, because
19 we didn't do anything to harm anybody or alter the
20 system, no. I didn't think --
21     Q.  You thought --
22         MS. JOHNSON: I'm sorry. Can he finish his
23 answer?

Page 100

1          MS. DEMPSEY: Yup.
2      A.  I just felt that once we were married, I
3  should leave.
4      Q.  Okay.
5      A.  And that was my intent before any of this
6  came up. My intent was to leave before any of this
7  fraternization came up. If they wanted me to leave by
8  February, I'll leave by February, three months early,
9  if that's what you want. This ain't going to kill me.
10     Q.  Did you think you were terminated?
11     A.  Yeah. In a sense I did, yeah.
12     Q.  Were you given an option to work in another
13 court?
14     A.  Not a very good option. They said I could
15 work elsewhere. I said, well, where? And they're
16 saying Plymouth. And I don't know if there was
17 anywhere else there. I know Plymouth was brought up.
18 That's 45 miles away. You give me eight bucks an hour
19 to travel down there for -- it doesn't make sense, for
20 $65 a day. As far as I'm concerned, I'm being
21 terminated.
22     Q.  Did you request --
23     A.  Just --

Page 101

1      Q.  I'm sorry. Go ahead.
2      A.  I'm sorry. Just -- just in a clever way.
3      Q.  Did you request a six-week transition period?
4      A.  For what?
5      Q.  Did you ask to have a six-week period before
6  you were let go?
7      A.  It was -- they wanted me -- they said I had
8  to leave, I think it was almost right away in January,
9  something like that. And I said, look, I got my
10 birthday coming up February 23rd. I'll be 65. Can I
11 at least work until then? That's the only thing I
12 asked for. And they said yes -- or I'll let you know,
13 and they said yes, that's okay, we'll do the 23rd. Or
14 the 22nd is when I left. So then I could apply for
15 Social Security.
16     Q.  Who did you think was responsible for you
17 being moved out of the Littleton District Court?
18     A.  Who do I think?
19     Q.  Yup.
20     A.  Family division.
21     Q.  And who in the family division?
22     A.  I think Michelle Brown, because I know she --
23 and, you know, I'm going to go back to that complaining

Page 102

1  about me all the time. It's just that I know Jason
2  came up on several occasions to complain -- or to go
3  over some things with me, I'm not doing this, not doing
4  that.
5      And I finally just got fed up with it, and I
6  could tell they were just zeroing in on me. That I'm,
7  what, 30, 40 feet down the hall. You can't come down
8  and tell me?
9      Q. Who was there -- I'm sorry. Go ahead.
10     A. No, that's it.
11     Q. Who was zeroing in on you?
12     A. Family division. I think -- I believe
13 Lisa -- I think Lisa went to Michelle Brown. Michelle
14 Brown came to me. Or complained about me, let's put it
15 that way. She didn't come to me.
16     Q. Anybody else besides Michelle Brown and Lisa
17 Towle who were zeroing in on you?
18     A. Not that I'm aware of.
19     Q. Did you contact Justice Broderick about the
20 issue of you being moved out of the Littleton District
21 Court?
22     A. I did call him, yes.
23     Q. And what did he say to you?

Page 103

1      A. I asked him about the situation. He says
2  I'll get back to you. And he did call me back later.
3  How long after, I can't recall. The same day or maybe
4  the next day. I don't know.
5      But anyhow, I asked him about this whole
6  situation of being pushed out. I said I just couldn't
7  understand it.
8      He came back, you know -- I always liked him.
9  He was a good talker, and he's also -- and he said,
10 well, they're trying to do this, trying to be
11 proactive.
12     And I just couldn't understand it. All of a
13 sudden, they're being proactive. And when I became
14 engaged to Michele and that point was brought up to
15 Kelly and how all of a sudden six, seven months later,
16 it's no good. You people got a problem. Somebody's
17 got a problem. But I wasn't going to create a problem.
18 I figure I'm gone in three months anyhow. I'm not
19 going to create a problem for Michele.
20     And I did tell Chief Broderick keep an eye on
21 Michele, that's all, just take care of her.
22     Q. Why did you tell him that?
23     A. Because of what happened to both of us. I

Page 104

1  just had a gut feeling. I just -- I had a gut feeling.
2      Q. What happened to both of you?
3      A. Well, I was terminated.
4      Q. Okay. And what happened to Michele?
5      A. Well, it was her or me, so I left, so she
6  stayed.
7      Q. Did you tell Justice Broderick why he should
8  keep an eye on Michele?
9      A. No.
10        MS. DEMPSEY: Can you mark this as an
11 exhibit.
12        (Discussion off the record.)
13        (Walker Exhibit 1 marked
14        for identification.)
15     Q. You can take a look at it, Mr. Walker.
16     A. Oh.
17     Q. What's been marked as Exhibit 1 is an e-mail
18 that says it's from yourself. I'd like you to just
19 look at it. Do you remember sending that e-mail?
20        MS. JOHNSON: You can read it first.
21        MS. DEMPSEY: Sure.
22        (Witness perused document.)
23     A. Yeah.

Page 105

1      Q. You sent that -- you can have it in front of
2  you. You sent that e-mail?
3      A. Yes.
4      Q. Okay. And the recipient of that e-mail was
5  Jason --
6      A. Jason.
7      Q. Jason Jordanhazy, your boss. As well as
8  Chief Justice Broderick, Don Goodnow, Judge Kelly and
9  Jeff Smith, correct?
10     A. That's what I did. I don't recall. But,
11 yeah, I guess so.
12     Q. Okay. I'm going to have you look at the last
13 paragraph where it states that you were lied to and
14 deceived. Let me know when you see that sentence.
15     A. Yeah. Okay.
16     Q. Can you read that sentence, please, out loud
17 and to the court reporter?
18     A. When I got there, the meeting consisted of
19 Don Goodnow and Kim France. Then I feel that I was
20 lied to and deceived.
21     Q. Who lied to you and deceived you?
22     A. Jason.
23     Q. And how did he lie and deceive?

Page 106

1   A. He said it was just going to be me and him.
2   Q. And can you read the last sentence of that
3   e-mail, please?
4   A. Therefore, from here on out you will be
5   hearing from my counselor.
6   Q. Meaning your attorney?
7   A. Yes.
8   Q. And did you see an attorney about this issue?
9   A. No, I didn't.
10  Q. Did you have an attorney at the time?
11  A. No, I did not.
12  Q. Never talked to a lawyer about bringing suit?
13     MS. JOHNSON: Objection. If he did, it would
14  be confidential.
15  Q. If you went to see -- did you ever go to see
16  an attorney about bringing a lawsuit?
17  A. I was going to.
18  Q. Did you see anybody?
19  A. No, I did not.
20  Q. Was Michele aware of your meeting with Jason?
21  A. Yes.
22  Q. Okay. Was she aware that you believed the
23  family division was out to get you?

Page 107

1   A. I don't recall.
2   Q. You didn't --
3   A. Was she aware of it?
4   Q. Right. Did you share with her that you
5   thought Michelle Brown and Lisa Towle were behind this?
6   A. Yes, I'm sure I did.
7   Q. Did she share in your belief that the family
8   division was out to get you?
9   A. I don't recall.
10  Q. She never told you that she thought you were
11  right or wrong?
12  A. I don't recall.
13  Q. I'm sorry. Did you answer?
14  A. Oh, I said -- I shook my head, didn't I? I
15  said, no, I don't recall. Sorry.
16  Q. Okay. Did Michele know Chief Broderick?
17  A. Yes.
18  Q. Was it Michele that encouraged you to contact
19  Chief Broderick?
20  A. Yes, she did.
21  Q. Okay. And why did she have you do that?
22  A. Well, he's the head man, and he seems to be
23  very sincere and honest, and I just believed in him.

Page 108

1   Q. Because -- but Michele told you to talk to
2   him?
3   A. Yeah.
4   Q. And how did Michele know him?
5   A. Oh, I don't know, from previous dealings in
6   the court system, what have you. She thought a lot of
7   him.
8   Q. Okay. You left the court in February of '08?
9   A. Um-hum.
10  Q. Okay. After you left, would you call Michele
11  during the day at the Littleton District Court?
12  A. Could have. I'm sure I did, but --
13  Q. Would you call her multiple times for
14  personal reasons?
15  A. I don't know. I don't recall. I really
16  don't.
17  Q. Would you speak to her more than once a day
18  while she worked at the court?
19  A. I don't know. Maybe. I don't know.
20  Q. Did your wife experience any harassment
21  before you left the court in February of '08?
22  A. I don't recall. I don't believe so.
23  Q. What was your home phone number at the time?

Page 109

1   At the time you left the court, I'm sorry.
2   A. I'm going to have to guess it's the same as
3   it is now.
4   Q. And what's that, sir?
5   A. 444-5703.
6   Q. And what was your cell phone number at the
7   time?
8   A. 616-7372.
9   Q. Thank you. You talked a little bit about Pam
10  Kozlowski. Pam was Michele's direct supervisor?
11  A. Yes.
12  Q. And what did Michele tell you about her
13  relationship with Pam?
14  A. They had a good working relationship, good
15  rapport.
16  Q. Did Michele like her?
17  A. Yes.
18  Q. Did she trust her?
19  A. Yes.
20  Q. What allegations did your wife make to Pam
21  Kozlowski? What did she tell Pam? Let me -- actually,
22  let me be more specific.
23     With respect to Lisa Towle, what did your

28 (Pages 106 to 109)

BRAGAN REPORTING ASSOC., INC.
(603) 669-7922

Page 110

1  wife tell Pam Kozlowski?
2      A. Well, I don't have everything in front of me.
3  I know there's all kinds of paperwork or whatever that
4  Michele wrote up. But I know one was the -- as we've
5  said before, the hairstyle, color, clothing, and some
6  of the goings on with the sexual harassment and what
7  have you. I don't remember specifically, but it should
8  be in there.
9      Q. All of the allegations that you're making in
10 this lawsuit, sir, are they all from your wife's notes
11 that you have?
12     A. I wasn't there, so yes.
13     Q. You have no independent knowledge of any
14 harassment, do you?
15         MS. JOHNSON: Objection to form.
16     A. I don't know.
17     Q. Did anybody tell you personally that your
18 wife was harassed at the court?
19     A. Not that I recall.
20     Q. You didn't witness it yourself?
21     A. Well, I wasn't there.
22     Q. Right. So all of the allegations that you
23 talk about, the hair, the clothing, the sexual

Page 111

1  comments, where do you get that information from?
2      A. Michele.
3      Q. Michele Walker, your wife?
4      A. From her -- well, yeah, from her notes.
5      Q. Okay.
6      A. And what she told me.
7      Q. And there's nothing besides those notes that
8  you rely on?
9      A. Other than -- well, other than the fact of
10 what I went through there with that fraternization
11 policy, no.
12     Q. So your own personal issue about whether you
13 could work at the Littleton District Court, correct?
14     A. Yeah.
15     Q. And your wife's notes?
16     A. I think it was just ball-busting.
17     Q. That's all of the knowledge you have?
18         MS. JOHNSON: Objection to form.
19     Q. All of the facts that are in your complaint,
20 they're based on your personal experience with the
21 fraternization policy or your wife's notes; is that
22 correct?
23         MS. JOHNSON: Objection to form. You can

Page 112

1  answer.
2         THE WITNESS: I can?
3         MS. JOHNSON: Yeah.
4         THE WITNESS: Oh, I didn't know what you were
5  saying.
6         MS. DEMPSEY: That's okay.
7         THE WITNESS: I'm sorry.
8         MS. DEMPSEY: That's okay.
9         THE WITNESS: I'm afraid to say something.
10        MS. DEMPSEY: No, that's fine.
11     A. Yeah, pretty much so, because I don't have
12 any firsthand knowledge of it or I wasn't present.
13        MS. DEMPSEY: Okay. Let me mark this as the
14 next exhibit.
15        (Walker Exhibit 2 marked
16        for identification.)
17        MS. DEMPSEY: Actually, let me mark this.
18        MS. JOHNSON: Is it all right if he's looking
19 at that while you're doing that?
20        MS. DEMPSEY: Yes. If you don't mind, feel
21 free to take a look at it.
22        THE WITNESS: Okay.
23        MS. DEMPSEY: Leslie's trying to be

Page 113

1  efficient.
2         (Walker Exhibit 3 marked
3         for identification.)
4         (Witness perused document.)
5      Q. BY MS. DEMPSEY: You all set?
6      A. Yeah, I guess so.
7      Q. I'm just going to have you look at the first
8  page of Exhibit 3. Exhibit 3 is the Amended Charge of
9  Discrimination. Do you see that, Mr. Walker?
10     A. Um-hum, yes.
11     Q. And if you look on that front page, it has
12 the date, the earliest date of discrimination,
13 July 3rd, 2008. Are you aware of any conduct involving
14 your wife being discriminated against prior to
15 July 3rd, 2008?
16     A. You're asking me to go back pretty far. I
17 don't recall any. I can't pinpoint time frames, I'm
18 sorry, other than what Michele talked to me.
19     Q. As you sit here today, do you have any
20 personal knowledge of any discrimination before
21 July 3rd, 2008?
22     A. I can't recall anything, but --
23     Q. Okay.

Page 202

1  Q. Would you attend any of the appointments?
2  A. I could not.
3  Q. Did you ever call any of her mental health --
4  her doctor or her mental health provider to tell them
5  about the delusions and the paranoia that you testified
6  about?
7  A. I didn't.
8  Q. You never made any complaints to her medical
9  providers about her condition?
10 A. I believe she did.
11 Q. Okay. Because she told you she was reporting
12 it? You didn't sit at the doctor's with her, correct?
13 A. No.
14 Q. Okay. So the only reason why you think she
15 told her doctors is because she told you that?
16 A. Yeah.
17 Q. Okay.
18 A. The only doctor I sat in on was Dr. Silva.
19 That's Reeves' husband. And I just explained what
20 happened and what we thought had happened. And he felt
21 strongly, as I best recollect, that it was not the
22 medication, not that particular medication.
23 Q. The medication that she was taking for her

Page 203

1  kidney infection?
2  A. Correct or -- yeah, I guess it was kidney
3  or -- yeah.
4  Q. Did he think that there was mental health
5  issues that your wife was going through?
6  A. Didn't say.
7  Q. Okay. Did you have concerns that your wife
8  was suicidal during the time from when she was
9  hospitalized to the time she actually committed
10 suicide?
11 A. No.
12 Q. Did you think that she could work during that
13 period of time?
14 A. There were one or two moments that she was
15 doing good, yes.
16 Q. And for how long would those moments last?
17 A. I don't know, long enough to write a letter
18 and ask to go back to work, but --
19 Q. Would she relapse?
20 A. Not like in the beginning. There were
21 certain things that would perhaps trigger her. She was
22 doing good one time. Don't ask me when. And there was
23 a -- that guy who lived across the street back in the

Page 204

1  woods, he stabbed somebody, almost killed them. Well,
2  the state police come knocking on my door and inquiring
3  about this and that across the street, so on, so forth.
4  I knew him. His name is Matt. Trying to think of his
5  last name. And he was inquiring. He and I were in the
6  kitchen. Michele hid back in the bedroom. She didn't
7  want to be known, seen, or anything else like that.
8       And I was just about going to take her up to
9  the Balsams for dinner. Everything was great up to
10 that point. And that incident with the stabbing, this
11 and that, she had a fear, going back to the knife.
12 Q. This was after she was hospitalized?
13 A. Yes.
14 Q. This event that you're describing?
15 A. Yes.
16 Q. Was it after she wanted to go back to work?
17 A. I don't recall.
18 Q. You did go on a cruise with Michele in August
19 of 2009?
20 A. Say that again, please.
21 Q. Sure. Do you remember going on a cruise with
22 your wife?
23 A. No.

Page 205

1  Q. Were you scheduled to go on a cruise?
2  A. No. My wife was.
3  Q. Oh, I'm sorry. You didn't go with her.
4  A. I'm being smart. Michele had -- Michele had
5  always wanted to take her kids on a cruise, and I
6  figured that's girl time. What had happened, prior to
7  that obviously she gets hospitalized, the whole nine
8  yards. Well, the doctors thought the -- you know, to
9  get away would be great, but that she go with another
10 adult besides her daughter and the other one with the
11 Down's. So she took her sister Debbie and Kelly's
12 cousin with them.
13 Q. Debbie's daughter?
14 A. No, Debbie's -- Kelly's cousin, Debbie's
15 granddaughter I guess.
16 Q. Michele took her sister?
17 A. Her brother's daughter's child.
18 Q. Okay.
19 A. Whatever that is. And Tricia is her name,
20 and so they went.
21 Q. Okay.
22 A. So I did not go. I just felt that it was
23 women's time out, which is what it was going to be

52 (Pages 202 to 205)

BRAGAN REPORTING ASSOC., INC.
(603) 669-7922

**Page 206**

1  originally.
2  Q. Did Debbie report any issues with Michele
3  while she was on that trip?
4  A. No.
5  Q. No? And did they take pictures while they
6  were on that trip?
7  A. Yes.
8  Q. And do you have those, sir?
9  A. I have some of them.
10 Q. At the time Michele was hospitalized, was Dr.
11 Reeves her primary care physician?
12 A. Yes.
13 Q. And had she been going to her for --
14 A. No, no, no, no, no. I'm sorry. Dr. Silva
15 was her primary.
16 Q. Dr. Reeves' husband?
17 A. Dr. Silva was. But she was so paranoid, she
18 didn't want anything to do with him. They were
19 mismatched, and so we finally switched over to his
20 wife, who was a little bit more understanding and
21 compassionate. She had better bedside manner, let's
22 put it that way.
23 Q. I think we talked about this briefly, but

**Page 207**

1  besides the notes that are here today, you indicated
2  Michele kept notes related to work in her desk?
3  A. Yes.
4  Q. And those were just gone when you folks went
5  in October --
6  A. Yes.
7  Q. -- to retrieve them? You also indicated in
8  your interrogatories that you recorded conversations
9  with your wife?
10 A. I know I recorded something, but I can't find
11 it.
12 Q. How --
13 A. And whether -- because I was doing it at the
14 time. When I told Michele I recorded it, she got all
15 upset and this and that. I probably erased it or just
16 got rid of it. It wasn't --
17 Q. She didn't know you were recording her at the
18 time?
19 A. No. I snuck that in there.
20 Q. Where were you going when you recorded her?
21 A. Home. We were coming back from Concord.
22 Q. You were in a car at the time?
23 A. Yes.

**Page 208**

1  Q. And why did you do that?
2  A. I just kind of felt that, you know, we got
3  all these written notes and this and that. I thought a
4  recording might be nice. Guess not. And if I have it,
5  I have no clue where it is. I've looked all over the
6  place. That's why I had mentioned it. And I thought I
7  still had it, but I went through all my tape recordings
8  and everything else, and I can't --
9  Q. Where were you in Concord on that day?
10 A. Coming back from one of the hearings that she
11 had.
12 Q. The Human Rights? Oh, one of the meetings
13 with Julie Moore?
14 A. Yeah, one of those. One or the other, yeah.
15 Q. The investigation in connection with her
16 Human Rights complaint?
17 A. Yes.
18 Q. Okay. And so you recorded a conversation you
19 had with her and you didn't tell her?
20     MS. JOHNSON: Objection. Can we take a
21 break, please?
22     MS. DEMPSEY: Not while a question is
23 pending.

**Page 209**

1      MS. JOHNSON: Okay. Well, I'm going to
2  instruct him not to answer until he's consulted with me
3  then, so --
4      MS. DEMPSEY: And what would be the basis of
5  the objection?
6      MS. JOHNSON: I need to consult with him.
7      MS. DEMPSEY: If he has a Fifth Amendment --
8  I mean, I do want the basis asserted before we --
9      MS. JOHNSON: Yes, he has a Fifth Amendment
10 privilege.
11     MS. DEMPSEY: Okay, that's fine. You can go
12 out and talk to him.
13     (Recess taken.)
14 Q. BY MS. DEMPSEY: How many conversations with
15 your wife did you tape-record?
16 A. I'm going to take the Fifth on that.
17 Q. Okay. On the advice of counsel, you're not
18 answering that question?
19 A. That is correct.
20 Q. Okay. Did you ever listen to the tape -- to
21 any of the tape-recordings you made of your wife?
22     MS. JOHNSON: Objection.
23 A. The Fifth.