Ex 1

# AFFIDAVIT OF ROSE CULVER

NOW COMES Rose Culver of 2 1/2 Beacon St, Suite 149, Concord, NH (business address) and upon oath states as follows:

1.      I am a member of the New Hampshire Bar and am in good standing.  My affidavit is based upon my representation of her, and my observations during my representation.

2.      I originally represented Michele Walker with respect to her employment with the State of New Hampshire.  My representation of Michele Walker commenced on or about October 6, 2009 (however I met with her prior to this date in September, 2009) up through the date of her suicide on May 3, 2010.  I subsequently represented the estate for some time until I withdrew from the case on December 8, 2010.

3.      Ms. Walker initially sought my advice because Defendant was not responding to her requests to return to work in September and October of 2009.

4.      Throughout my representation of Ms. Walker, her goal was for the truth to be known about the hostile environment she had suffered through.

5.      Ms. Walker wanted to do the right thing by reporting the issues, and having them investigated.  I perceived her motivation to be as she stated to me, to have the unhealthy environment end so that she could return back to work in a healthy environment and one with mutual respect.  She was not asking for anyone to be terminated.

6.      It was clear to me that Ms. Walker loved her job, except for the harassment and retaliation she reported.   It was clear that Ms. Walker derived a great deal of professional satisfaction from her job, and it was important to her as a member of the local community.

7.      I represented Ms. Walker before the NH Commission for Human Rights.  We filed the initial Charge of Discrimination on or about January 25, 2010, due to encroaching

1

statutory deadlines.   See Ex. 2, Charge of Discrimination filed January 25, 2010, which is a true and accurate copy signed under oath by Ms. Walker.

8.     At the time the original Charge was filed, Ms. Walker was still hoping to return to work, instead of filing litigation in Court.

9.     Ms. Walker was upset about Paula Hurley's investigation of her initial complaint. It seemed to Ms. Walker that Ms. Hurley started the investigation without having the appropriate training, and she was apparently not willing to truly investigate Ms. Walker's complaints.   Ms. Hurley did not review pertinent documentation (including the Towle restraining order/stalking files), and barely conducted any interviews, some of which only occurred by phone after Ms. Walker insisted.

10.     Ms. Walker reported to me that Ms. Hurley was hostile, and told her that all she had was "a big story".

11.     I assisted Ms. Walker with the follow up letter of complaint that Ms. Walker submitted on or about November 9, 2009, based on information provided by Ms. Walker.  See Ex. 4, which is a true and accurate copy.

12.     It is my understanding that the information about the sexual harassment contained in the November 20, 2009 letter was some of the information of which Ms. Walker had been trying to meet with Judge Kelly about, because she was uncomfortable with Ms. Hurley as an investigator.  It is also my understanding that the information on sexual harassment is some of what Ms. Walker had been reporting to Ms. Kozlowski, her supervisor.

13.     During my representation of Ms. Walker, we were not informed of any conclusions from the Hurley investigation.

2

14.     It was my understanding that Ms. Walker informed her supervisor Pamela
Kozlowski of much of the ongoing sexual harassment, but that Ms. Kozlowski did not act on it,
and discouraged her from bringing it to anyone else's attention, because people would think they
were "crazy".

15.     It is my recollection that after the November 20, 2009 letter to Jeffrey Smith,
Defendant hired Julie Moore as counsel.  I had several conversations with Ms. Moore about
trying to get Ms. Walker back to work.  I was discouraged by the progress and attitude I was
encountering.

16.     Ms. Howe was hired after the November 20, 2009 letter, to investigate the
allegations of sexual harassment.  Ms. Walker, and myself, were lead to believe that this would
be an "independent" investigation, which we took to mean from an outside person and unbiased.
We expected the investigation to be about Ms. Walker's complaints of harassment, however it
expanded into alleged wrong-doing by Ms. Walker, months or years previous to the allegations,
for which I could see no relevance.  Our hope that the investigation would be professional and
independent evaporated.

17.     The original first interview was to be in early December 2009, but Julie Moore
did not show up at the meeting place in Plymouth, NH.  The previous evening, Attorney Moore
was unequivocal in her order that we were to show up for the meeting and that the investigation
would go on regardless that day as they would be interviewing other individuals.  When we
arrived for the interview, Ms. Howe refused to question Ms. Walker in Julie Moore's absence.  It
was clear to me that there was a negative attitude towards Ms. Walker by Attorney Moore, and
that this was an adversarial process.  See Ex. 5, my 12/11/09 email to Attorney Moore, and Ex 8,
my 4/6/10 letter to Attorney Moore, which are true and accurate copies.

3

18.     The next investigation meeting was scheduled for December 18, 2009, however it did not go forward because Ms. Walker was unable to attend due to medical issues, as indicated by her counselor Ms. Brodzinski.

19.     The first day of Ms. Walker's interview was then scheduled for January 8, 2010, however it was cancelled due to Ms. Howe's alleged unavailability.   The first interview ultimately occurred on January 12, 2010 and lasted for approximately 6 hours, including a one hour lunch break, and was very difficult for Ms. Walker for reasons in paragraphs below.

20.     The second interview also was for approximately the same number of hours.

21.     Present at both interviews were Ms. Walker, myself, Attorney Julie Moore (Counsel for AOC), investigator Ms. Christine Howe, and Yvonne McAllister (note taker from AOC).   Both interviews occurred at the Plymouth District Courthouse.

22.     When we arrived at the Plymouth District Courthouse, we were taken in through the back door.  It was clear Judge Kelly was in the building as his car was in the parking lot. It was extremely stressful for Ms. Walker to be interviewed in such location as it was already apparent by Judge Kelly's lack of positive communication to Ms. Walker since her initial complaint that he was not supportive of Ms. Walker.

23.     The first half of the first interview day, January 12, 2010, did not seem out of the ordinary.  However, after lunch the tone changed drastically.  Ms. Howe became more of a cross-examiner and asked questions in a hostile manner.   It was my sense that Ms. Howe and Attorney Moore had discussions with Judge Kelly during the hour-long lunch break.

24.     Ms. Walker appeared to be agitated and upset by the tone of the questions.  It was clear to me that Ms. Walker was very distressed by the tone of the interview.  This also occurred

4

during the second interview. It is my recollection that Ms. Walker needed to take medication for anxiety through the interviews, and on one occasion, she went into the bathroom during a break ostensibly to take an additional pill. I understood that she was already on medication to handle the stress of each interview.

25.     The second interview occurred on February 5, 2010, at the Plymouth District Court, and was also very difficult, primarily due to the continued hostility and location of the interviews as described herein.

26.     As the investigation proceeded, it appeared to me to be extremely hostile, and Ms. Walker expressed the same opinion to me. The hostility included, but was not limited to the following:

A.      Ms. Howe's tone was at times very hostile, particularly in the afternoon portion of the interview. It was as if a switch had been flipped;

B.      To the best of my recollection, Ms. Howe rudely and in a hostile tone and facial expression asked Ms. Walker, "Were they fucking?"

C.      Ms. Howe yelled at Ms. Walker, and myself, to the point that at the end of the second interview she apologized for screaming.

D.      During one of the interviews, Ms. Howe mocked Ms. Walker's emotional state, commenting to Ms. Walker that she didn't look like she was nervous or upset; and

E.      On at least one occasion during the afternoon of the second interview, Attorney Moore passed notes to Ms. Howe. This was not mentioned in the transcript as I erred by not make mention of it for the record.

5

28.     The interviews were never pleasant, but in the afternoon of both interviews the tone changed.  At the end of the second interview, Attorney Moore was yelling at me and also had a hostile expression and demeanor.

27.     Ms. Walker appeared to me to become extremely more agitated as the investigatory process wore on, during which she was treated poorly as described herein.

28.     The interviews seemed to focus to a large extent about some alleged wrong-doing in Ms. Walker's past (many months or years prior to the allegations), such as her work schedule. It was as if Ms. Walker became the focus and was under intense scrutiny.  I failed to understand how this was relevant.

29.     Ms. Walker was also questioned about her husband leaving the Court as a security officer.  While Ms. Walker did not think that situation was handled well in early 2008, it was not something she ever expressed anger to me about.  Mr. Walker seemed to be happy in his new position during my representation of Ms. Walker.  Mr. Walker's leave from the court was a planned event for the both of the Walkers.

30.     Ms. Walker expressed to me her extreme fear of Lisa Towle on an ongoing basis, as well as her problems dealing with the sexual harassment.

31.     Ms. Walker prepared the 24 page summary to assist in the investigation in which she was participating.  We did not know if we would need to litigate at that point, as Ms. Walker's goal was to get back to work.  My understanding is that she prepared this from her notes and her memory.  Part of the reason that Ms. Walker prepared this was because of the first interview, in which she felt so attacked. She believed that it was a short cut to avoid having to endure as many hours of a hostile investgation.

6

32.     We turned the 24 page statement over at the second interview on February 5, 2010. This document was drafted predominantly by Ms. Walker. I only helped clean up the grammar, such as sentence structure, and re-ordering events, in an effort to make it more readable.

33.     I have reviewed Defendant's Exhibit F and, except for the wire bound copy, I recognize those documents to be copies of what Ms. Walker showed me, which includes the 24 page statement I helped make presentable. I believe the wire bound journal was recovered from a locked file in the courthouse after her death. I do not recall if I saw the left handed date book but I recognize Ms. Walker's handwriting in the wire bound journal and the left handed book.

34.     At the second interview, we asked that Ms. Howe take time to read the journal so that Ms. Walker would not have the emotional turmoil of repeating it all again. That way the questions could be focused on what was already down in the statement. Ms. Howe refused.

35.     By notes of February 26, 2010 and March 3, 2010, Ms. Walker's therapist, Ms. Brodzinski, ordered that Ms. Walker could not attend any more interviews, or work, as the interviews had "exacerbated her symptoms of PTSD, anxiety and depression." See Ex 6 and 7, which are true and accurate copies.

36.     A third meeting was scheduled for March 12, 2010 by Attorney Moore through a March 1, 2010 letter. On March 2, 2010, I informed Attorney Moore that Ms. Walker would be unable to be physically present for a third interview, as decided by her healthcare provider. I requested an extra few weeks for Ms. Walker to recuperate. Subsequent to this, on March 3, 2010 and effective that day, Attorney Moore informed me that Ms. Walker was being taken off paid leave and was being placed on unpaid leave of absence. Attorney Moore indicated that Ms. Walker had a specific amount of accrued time off that was available to her. Ms. Walker was

even more concerned from that point about the duration of the investigation and that her benefits would run out before she got back to work. Her concern increased as each of the next two interview dates were postponed. Ms. Walker was extremely upset about the way things were unfolding and was manifesting extreme anxiety.

37.     A further interview was scheduled for March 23, 2010, however the day before Attorney Moore informed me that the investigator's grandfather was sick and that they had to reschedule.

38.     The next interview date was scheduled for April 13, 2010, but was cancelled once again by Attorney Moore the previous morning. No reason was given for the further delay.

39.     Just prior to Ms. Walker's suicide, Defendant was pushing to schedule what hopefully would have been her last interview. Even though her doctor/ counselor had not released her to attend, I was being pushed by Attorney Moore to have her scheduled and relayed that to Ms. Walker.

40.     Ms. Walker's last interview was scheduled for Thursday, April 29, 2010. It was to take the entire day. I was increasingly concerned about Ms. Walker's ability to get through the final interview, let alone get to the interview. On April 26, 2010 through a letter emailed and faxed to Attorney Moore, I canceled the interview. See Ex 9, letter dated April 26, 2010, which is a true and accurate copy.

41.     Ms. Walker killed herself on May 3, 2010, just over a week later.

42.     As far as destruction of some of the documents, Ms. Walker was not aware they would be needed. I believe she explained that she was having trouble looking at them due to the trauma and she was so upset about how things were unfolding that she shredded some documents. She was not trying to hide anything.

8

43.     Early on in my representation of Ms. Walker (in October 2009), she  told me about the file she had kept at the office, that was missing when she went to get it as well as other items such as some of her shoes.  She told me that this file contained a lot of documentation and notes about her complaints, including those concerning sexual harassment.

44.     We asked Defendant for that file, and it was never produced.  When I went to clean out Ms. Walker's desk after her suicide, it was determined that everything would have to go through AOC and be catologued.  While I was at Court I did not see what Ms. Walker had described to me as her file, and it did not turn up when the Defendant turned over the contents of her desk and file cabinet where she had apparently kept her private property.

45.     One of the things Ms. Walker's medical provider suggested was a door between District Court and Family Division, something Ms. Walker had been trying to implement before her departure.


FURTHER AFFIANT SAYETH NOT.


                                        /s/ ROSE M. CULVER
                                        Rose M. Culver

STATE OF NEW HAMPSHIRE
COUNTY OF MERRIMACK

        Personally appeared Rose Culver, on this 13th day of April 2013, and upon oath affirmed that the above facts are true and accurate to the best of her knowledge and belief, before me


                                        /s/ DAVID C. MURDO
                                        Notary Public
                                        My commission expires:      04/13/2016


9