**EXHIBIT 3**

**AFFIDAVIT OF JENNIFER ELLIOTT**

NOW COMES Jennifer Elliott, of 46 Holderness Road, Center Sandwich NH 03227 (business address of Law Office of Leslie H. Johnson, PLLC), and upon oath states as follows:

1.    I am employed as a legal secretary with the Law Office of Leslie H. Johnson, PLLC.

2.    I reviewed portions of the following deposition transcripts:

    a.    Michelle Brown dated 10/22/12;
    b.    The Honorable Edwin Kelly dated 11/07/12;
    b.    Brenda Knapp dated 10/19/12;
    d.    Pamela Kozlowski dated 10/19/12 and 10/26/12;
    e.    The Honorable Lawrence MacLeod dated 11/07/12;
    f.    Attorney Jennifer Moeckel dated 03/29/13; and
    g.    Lisa Towle dated 11/02/12;

all of which are true and accurate copies of excerpts from each respective deposition transcript.

3.    I reviewed portions of said deposition transcripts to determine which allegations of Paragraphs 13 and 14 of the Complaint had been observed by the witness; whether the witnesses had knowledge of the items discussed in Paragraphs 13 and 14 of the Complaint (whether told by Michele Walker or otherwise had knowledge); and/or, whether any witnesses agreed that said items constituted harassment or were otherwise inappropriate for the workplace.

4.    Attached hereto as Exhibits 3B through 3H are true and accurate copies of my notes (which list the pages at which each item of Paragraphs 13 and 14 of the Complaint are discussed) and the referenced pages from said deposition transcripts. I do not know whether said items are discussed at other pages in said deposition transcripts. Where signature pages are missing to the deposition transcript, it is because we have not received them back from opposing counsel.

5.   After completing my aforementioned review, I then marked up Paragraphs 13 and 14 of the Complaint, attached hereto as Exhibit 3A. For each item that was observed, it is circled for each witness that observed it. If it is circled twice or more, this indicates multiple witnesses observed it.

6.   Each time the item has at least one witness who was aware of it or heard about it, the item is underlined. If it is underlined twice or more, this indicates multiple witnesses were aware of it.

7.   For each witness who agreed that if the item happened, it could constitute harassment, or at least be inappropriate in the workplace, I placed the witness's initials next to the item. Initials are MB for Michelle Brown; EK for The Honorable Edwin Kelly; BK for Brenda Knapp; PK for Pamela Kozlowski; LM for The Honorable Lawrence MacLeod; JM for Attorney Jennifer Moeckel; and, LT for Lisa Towle.

FURTHER AFFIANT SAYETH NOT

_____/s/ JENNIFER ELLIOTT_____
Jennifer Elliott

STATE OF NEW HAMPSHIRE
COUNTY OF CARROLL

Personally appeared Jennifer Elliott on this 19th day of April 2013, and upon oath affirmed that the above facts are true and accurate to the best of her knowledge and belief.

Before me,

_____/s/ MONA J. TARDIF_____
Print Name:   Mona J. Tardif_____
Notary Public
My commission expires:_____05/09/2017_____

2

_— =has Knowledge_
_O= observed_
_initials = agrees this_
_Would be hostile or harassment_

Plaintiff in care of her attorney on or about 06/06/11, and this Complaint is filed within 90 days of receipt of the Dismissal and Notice of Rights.

## STATEMENT OF FACTS

12.     Michele M. Walker was employed as Clerk of the Littleton District Court n/k/a the NH Second Circuit–Littleton District Division commencing on or about 11/09/96. At all times, she was qualified for the position and performed her job well.

_EK JM_ 13.     During the course of her employment from the winter of 2007 until she left work on or about 08/20/09, Plaintiff was subjected to severe and/or pervasive sexual harassment which created a hostile work environment. Said harassment included, but was not limited to:

_PK EK JM LF_ a.     Repeated requests by coworkers to participate in homosexual activity even though she was known to be heterosexual and married;

_PK EK JM LF_ b.     Coworkers repeatedly and openly discussing openly participating in homosexual activities with one another;

_PK EK JM LF_ c.     Coworkers bringing in and showing pictures of homosexual parties they were involved in.

_EK JM LF_ d.     Comments such as:

_EK JM LF_ i.     'I can still land a guy in his twenties;'

_PK EK JM LF_ ii.     'I gave the bailiff a blowjob and he never had it done with a tongue ring before;'

_PK EK JM LF_ e.     Numerous sexual comments made back and forth between two or three coworkers about a judge of the Littleton District Court, which for purposes of decency the comments will not be set forth herein. In fact, coworker M. Brown ('Brown') openly discussed her sexual feelings for this judge;

4

EX 3A

PK EK JM LF (f.)     Sexually offensive jokes;

PK EK JM LF g.      Coworker L. Gilman ("Gilman") lifting up her shirt showing her belly ring

to Plaintiff and asking if Plaintiff wanted to see her nipple rings;

EK JM LF (h.)     Plaintiff picked up the Family Division phone to cover for absent

coworkers when a male voice said, "Hello, Mrs. Blowjob. You were good last night."

When Plaintiff identified herself, the individual hung up;

PK EK JM LF i.      In 2008, Gilman circulated a sexually explicit joke via email. Instead of it

going to Plaintiff's email, it went to M. Walker at Lancaster Probate Court who contacted

Plaintiff and stated she did not like the email and found it very offensive. To the best of

Plaintiff's knowledge and belief, M. Walker filed a complaint with the Administrative

Office of the Courts against M. Brown;

EK JM LF (j.)     In the beginning of 2009, Brown made phone calls back and forth with her

boyfriend and then announced to everyone that she would be going home for a very long

lunch hour, that she could not wait to see her boyfriend because "they had things to catch

up on," insinuating sex. Brown was gone for two hours. When Brown returned, she had on

a different set of clothes. When asked why she changed her clothes, Brown stated she had

no choice;

PK EK JM LF k.      Brown, referring to a NH State Trooper she thought was attractive stated, "I

just want to lick his teeth," and,

PK EK JM LF l.      On or about 08/17/09, Brown asked Plaintiff if her husband could "still get

it up or does it not work anymore," referring to an erection.

√M 14.    During the course of her employment from the winter of 2007 forward, Plaintiff was subjected to a hostile work environment and retaliation, including but not limited to the additional following events:

PK JM a.    L. Towle ("Towle"), a coworker of Plaintiff, calling her a bitch on several occasions;

PK JM b.    Towle yelling and screaming in her face on numerous occasions;

JM c.    Towle saying to Plaintiff such things as, "I hate you," "You're such a princess," and "I don't have to listen to you."

PK JM (d)    On or about 07/21/09, Towle made a comment that she had a lot of knives at home with lots of names on them and then looked directly at Plaintiff and smirked;

PK JM e.    On or about 08/11/09, Towle became red-faced and angry, yelling at Plaintiff, "I told you not to answer my phones or wait on the customers!"

PK JM f.    On or about 08/12/09, Towle again became red-faced and angry toward Plaintiff. Towle was so angry that her hands were shaking, and she said, "Go ahead, talk to Brown, bitch. It won't do you any good now. They will believe me not you!" At this point, Plaintiff became scared for her safety at work;

PK JM g.    On or about 08/13/09, Towle approached Plaintiff on at least three occasions that day, yelling and red-faced; and,

PK JM h.    Plaintiff observed other improper activities at work which were contrary to various public policies, including but not limited to the following:

PK JM (i.)    Towle telling Plaintiff that she went with her son to her ex-husband's house in the middle of the night so he (the son) could write foul things

6

on the ex-husband's vehicle. Plaintiff reported this to Judge Cyr, Brown and P.

Kozlowski ('Kozlowski'). Nothing was done about it;

PK JM (ii.)     Towle discussing her personal legal problems with her attorney

in a loud and very upset manner at the court window during business hours;

PK JM iii.     Towle reviewing financial information in confidential

documents submitted to the Littleton Family Division for her own dating

purposes;

PK JM (iv.)     On or about 08/17/09, Brown sat at a spare desk in the

District Court office and shopped for a car online most of the day.

15.     Despite Plaintiff having made multiple complaints to her supervisor, Kozlowski,

regarding the sexual harassment, hostile work environment, and inappropriate activities of

coworkers as set forth in court policy, Plaintiff was actively discouraged by Kozlowski from

bringing the nature of the incidents to light and informed Plaintiff she was afraid of what would

happen to Plaintiff if she reported the incidents. Kozlowski failed/refused to take corrective

action to report Plaintiff's complaints in accordance with the court's harassment policy, or to take

other steps to help Plaintiff escape said harassment. Kozlowski repeatedly told Plaintiff that G.

Apicelli ('Apicelli'), Kozlowski's direct supervisor, did not like Plaintiff, that the incidents were

occurring in the Family Division and were, therefore, outside of Kozlowski's ability to do

anything about them, that Brown was one of Apicelli's "golden girls," and Plaintiff should not make

any complaints against Brown if she knew what was good for her.

16.     To the best of Plaintiff's knowledge and belief, Apicelli was in charge of the

Family Division as well as being Kozlowski's direct supervisor.

Brown

| | Knowledge | Observed |
|---|---|---|
| 13a | | |
| 13b | | |
| 13c | | |
| 13di | | |
| 13dii | | |
| 13e | 118-119 | 118-119 |
| 13f | | |
| 13g | | |
| 13h | 121 | |
| 13i | 122 | |
| 13j | 122-123 | 122-123 |
| 13k | | |
| 13l | | |
| | | |
| 14a | | |
| 14b | | |
| 14c | | |
| 14d | 73,75,80,81 | 73,75,80,81 |
| 14e | 124,125 | |
| 14f | | |
| 14g | | |
| 14hi | 125,126 | 125,126 |
| 14hii | | |
| 14hiii | | |
| 14hiv | 128,129 | 128,129 |

47-129

EX 3B

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Estate of Michele M. Walker, Charles E. Walker,

Administrator

VS                NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of

the Courts and State of New Hampshire - NH Second

Circuit Littleton District Division -

Administrative Office of the Courts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF MICHELLE BROWN

    This deposition taken by agreement of counsel

at the Office of the Attorney General, 33 Capitol

Street, Concord, New Hampshire, on Friday,

October 22, 2012, commencing at 9:05 A.M.

1    that you needed to call Michele?

2  A    I spoke -- I reached out to Gina during this

3    whole exchange, and this response was based on

4    my guidance from my administrator, from Gina,

5    and then when I sent her the e-mail where

6    Michele says she is going to be contacting HR,

7    Gina told me to pick up the phone and just

8    call her, figure out what it is about.

9  Q    And when you say this e-mail, AOC 1437?

10  A    Correct.

11  Q    And when you called Michele, do you recall

12    what she told you?

13  A    She told me she had concerns about Lisa

14    copying her, and her hair.

15  Q    Had she ever complained to you about that

16    before?

17  A    No.   About her hair, there was mention of a

18    birthday that took place, and I think it was

19    Martha's birthday, and that Lisa made a

20    comment about the knife, and Michele thought

21    it was directed towards her.   I don't remember

22    what else she had told me.   I took notes that

23    day when I spoke to her.

1                 MS. DEMPSEY:  Wait for a question.

2  Q    We are looking at Exhibit 15, and let me

3       switch originals for you.

4                 When were these notes from?

5  A    I don't remember this first page that is on

6       here, but it looks like the pages thereafter

7       are me just writing down the things she is

8       telling me, and I can remember being really

9       quiet during the phone call and telling

10      Michele, I want to let you know I am still

11      here, I am just taking notes about everything

12      you are telling me.

13                She was telling me an awful lot.

14      Here is the reference to the knife.  This

15      definitely.  I just don't remember this piece

16      of it.

17 Q    And you mean the first page?

18 A    Correct.

19 Q    But it is your writing?

20 A    Yes, it is.

21 Q    And let me show you this, I think this is your

22      typewritten version of that, and let me know,

23      take a look at it, and I will have it marked

1  A   Having an outburst, would be inappropriate.

2  Q   Lisa forbids Michele to help customers

3      regarding pulling forms, is that appropriate

4      or inappropriate?

5          MS. DEMPSEY:  Objection as to form.

6      You can answer.

7  A   Both courts should help each other out.

8  Q   What about the report that "Lisa has an

9      attitude, gives angry looks and is

10     disrespectful," would that be conduct that

11     should occur?

12 A   Which one is that?  That is not good conduct,

13     I guess.

14 Q   Michele reported to you she couldn't work with

15     Lisa due to her insubordination.

16 A   Is there a question?

17 Q   Did Michele report that to you?

18 A   That is what she told me in that phone call.

19 Q   And the next paragraph is about the birthday

20     cake.

21         "They had cake, and when Stan got

22     the knife, Lisa made a comment something like

23     I have a special knife for special people and

1    was looking at Michele."

2                    Was that a comment that was of

3    concern to you?

4 A  I just learned of it.  This is again, this is

5    what -- I am describing what Michele had told

6    me over that phone call.

7 Q  And my question is, after the phone call,

8    thinking back about the conversation, the

9    comment of the knife, was that something that

10   raised a concern to you?

11                   MS. DEMPSEY:  Objection as to form.

12   You can answer.

13 A  This didn't raise -- No, it didn't when I

14   heard that.

15 Q  If, in fact, that happened, would that concern

16   you?

17                   MS. DEMPSEY:  Objection as to form.

18   You can answer.

19 A  I guess it depends in what context it was

20   said.  I can't --

21 Q  "I have a special knife for special people,

22   and was looking at Michele"?

23 A  If she said that --

1  Q    Could you turn to page 4, and look at number

2       13, and I know you are only there every few

3       weeks at Littleton District Court, correct?

4  A    I could have been there every week, every

5       other week.  I could have been there for an

6       extended period of time.  It all depended on

7       the use -- there was no set schedule.  It is

8       not necessarily every few weeks.  It could be

9       once a week.  I could have been there for an

10      extended period of time, or again, I could

11      have been there once a month.  It was just all

12      about need.

13 Q    And in July and August of 2009, you don't

14      recall how often you were there?

15 A    I don't, no.

16 Q    Looking at number 13, if you could go through

17      to yourself, and read A and then B and then C,

18      and let me know -- if you get to one where you

19      know, have any factual knowledge about the

20      allegations?

21            MS. DEMPSEY:  Objection as to form.

22 Q    We can go through each one.  Number 13A, I am

23      not going to read it into the record.  You can

MICHELLE BROWN        October 22, 2012

Page 118

1    read it to yourself, and then I will ask you a
2    question.
3  A   Okay.
4  Q   Do you know anything about that?
5  A   No.
6  Q   B, do you know anything about B?
7  A   No.
8  Q   How about C?
9  A   No.
10 Q   How about D-i?
11 A   No.
12 Q   How about D-ii?
13 A   No.
14 Q   Do you even know who that refers to, D-ii?
15 A   No.
16 Q   E?
17 A   I know what this is in regards to.
18 Q   What is it in regards to?
19 A   Michele had said that I had made comments
20     about Judge MacLeod and whether or not he wore
21     underwear or boxers, something to that effect.
22 Q   Had you made any comment about that?
23 A   I did.

Page 119

1  Q   And when, approximately, was that?
2  A   I don't recall.
3  Q   Do you remember if you made that comment more
4      than once?
5  A   I don't know if I did.
6  Q   Do you remember what else you said about judge
7      Brown?
8  A   Judge MacLeod.
9  Q   I am sorry, Judge MacLeod?
10 A   No.
11 Q   Do you remember something about ordering
12     hamburgers and beef with respect to Judge
13     MacLeod?
14         MS. DEMPSEY:  Objection as to form.
15     You can answer.
16 A   Not in regards to Judge MacLeod, no.
17 Q   In regards to someone else?
18 A   When the comment about the big beef was made
19     to me by Michele and Brenda and others, when I
20     was there, they knew I liked cheeseburgers,
21     and they would say, okay, Brownie, Porfido's
22     menu came through.  You want the big beef and
23     kind of like sexual innuendo, but it wasn't --

Page 120

1    it was not me saying it.  I was the recipient
2    of the joke.
3  Q   Page 5, number F at the top, do you recall any
4      sexually offensive jokes?
5  A   I don't recall any specifically.
6  Q   Do you remember some of that nature?
7  A   We would joke around.  I don't remember any
8      sexual jokes, but we would joke around about
9      any number of things, and I guess there could
10     have been a sexual joke of some sort.
11 Q   But you don't recall any now?
12 A   No.
13 Q   What about Lynn Gilman, number G.
14 A   No.
15 Q   But you are aware she has a belly ring?
16 A   I know she did.
17 Q   How do you know that?
18 A   I don't know how I know, but I know she had
19     one.
20 Q   Had you seen it?
21 A   I don't know if I have or not.  I think -- I
22     don't know.  I don't know.  I think I did.  I
23     think she actually bought a piece of jewelry

Page 121

1    once and showed it to me, but I don't recall
2    when or anything like that.
3  Q   And H?
4  A   Yes.
5  Q   What do you know about that?
6  A   That was my ex-boyfriend who called the court,
7      and I don't know what he said to Michele, but
8      that is what was reported or told to me.
9  Q   And who is that ex-boyfriend?
10 A   Charles Desroches.
11 Q   How do you spell that?
12 A   D-E-S-R-O-C-H-E-S, I think.
13 Q   Where does he live currently?
14 A   I have no idea.
15 Q   Where did he live at the time?
16 A   Boston.  He lived in Boston for a period of
17     time and then Littleton.
18 Q   When Michele commented to you about that, did
19     she seem upset?
20 A   No.
21 Q   Did you apologize to her?
22 A   No.  I don't remember if I did.  I don't know.
23 Q   Do you know why Charles would think you were

CONNELLY REPORTING & VIDEO SERVICES

Page 122

1    at Littleton that day?
2  A  It is one of the courts I work at. I don't
3     know.
4  Q  I?
5  A  I remember something about that.
6  Q  What do you recall about it?
7  A  That a Lancaster employee got an e-mail that
8     went to -- so Lynn sent it to the Lancaster
9     person by accident, and I remember Michele was
10    upset because the Lancaster person made an
11    issue of it, and she thought that was
12    ridiculous. That's when Michele went and
13    changed her e-mail address to be like, just
14    instead of her first initial and last name,
15    she included her middle initial so that type
16    of thing wouldn't happen again.
17 Q  You remember the conversation you had with
18    Michele Walker about this?
19 A  No, I don't remember exactly. I just remember
20    kind of the, what I had just said.
21 Q  How about J?
22 A  I am sure I made phone calls to my boyfriend.
23    I could have gone home, because my home was

Page 123

1     very close to the courthouse. I never met my
2     boyfriend at home for lunch or sex, and I
3     don't recall ever having on different clothes
4     when I went back to work.
5  Q  So the last comment also you don't recall?
6  A  No.
7  Q  What about K?
8  A  I don't recall ever saying something like
9     that.
10 Q  Is it possible you did?
11 A  I just don't --
12        MS. DEMPSEY: Object as to form.
13    You can answer.
14 A  I don't recall saying it. It is nothing I can
15    picture myself saying, to be honest.
16 Q  L?
17 A  No.
18 Q  And then number 14, starting with A?
19        MS. DEMPSEY: The question is, does
20    she know.
21 Q  Does she have any information related to A?
22 A  No.
23 Q  And B, the question is did anyone report this

Page 124

1     to you -- strike that.
2         My question is, did you witness
3     anything in B?
4         MS. DEMPSEY: Is that the same
5     question for A, did she witness anything?
6     Did you witness A?
7  A  No.
8         MS. DEMPSEY: Before we can have the
9     answer, we have to understand the question.
10 Q  Let me clarify. Did you observe any of this
11    conduct, so A is no, and B is --
12 A  No.
13 Q  And C is no?
14 A  No.
15 Q  And D, we have already talked about that
16    comment, correct, the knife comment?
17 A  Right, I didn't witness that.
18 Q  But that is what Michele reported to you?
19 A  Among other things, yes.
20 Q  How about E?
21 A  I didn't witness it.
22 Q  You are still answering, and then I will
23    follow-up.

Page 125

1  A  Okay.
2  Q  But Michele did complain to you about that?
3  A  Yes.
4  Q  And F, you did witness it?
5  A  No.
6  Q  Did Michele complain about it?
7  A  No.
8  Q  And what about G, did you witness it?
9  A  No.
10 Q  Did Michele complain to you about it?
11 A  I don't remember. No. No.
12 Q  You don't remember?
13 A  I don't remember at this point. In the
14    e-mails you showed me, I don't remember if
15    that was one of the things she complained of.
16 Q  H says plaintiff observed other improper
17    activities at work which were contrary to
18    public policies, including but not limited to
19    the following.
20        My question is, did you have any
21    observation about H little i?
22 A  I knew --
23        MS. DEMPSEY: The question is did

32 (Pages 122 to 125)

Page 126

1    she observe Towle telling plaintiff?
2  Q  Yes, did you observe?
3  A  Yes.
4  Q  But then Towle told you something similar to
5     this?
6  A  She told me that her son wrote with like
7     windshield marker on his dad's windshield or
8     tailgate or something like that.
9  Q  How did that come up between the two of you in
10    conversation? Was she bragging about it?
11         MS. DEMPSEY: Objection as to form.
12    You can answer.
13 A  I don't remember how it came up in
14    conversation.
15 Q  You didn't take any action against her because
16    of that incident?
17 A  No, I didn't.
18 Q  Did you think that was something that was
19    conduct unbecoming to a judicial person?
20 A  It was her son, not her.
21 Q  Are you aware of whether she took her son to
22    do that?
23 A  I don't know that.

Page 127

1  Q  If she had taken her son in a car for the
2     purpose of doing that, would that be conduct
3     unbecoming a judicial person?
4          MS. DEMPSEY: Objection as to form.
5     You can answer.
6  A  I think it is unbecoming.
7  Q  And Rule 27, if you want to take a look at
8     that, that would be in violation of that rule?
9          MS. DEMPSEY: Objection as to form.
10    You can answer.
11 A  In my opinion, let me look at the rule again.
12 Q  For the record, my question is in your opinion
13    would that conduct be in violation of Rule 27?
14         MS. DEMPSEY: If the conduct
15    happened.
16 A  I don't know if the personnel rule applies.
17    Again, I don't think -- I wouldn't accompany
18    my son, so I don't know. I don't think --
19    it's not behavior I would encourage my own son
20    to do.
21 Q  Roman numeral little ii, we discussed that
22    earlier?
23 A  Yes.

Page 128

1  Q  You didn't observe it, correct?
2  A  I did not observe it.
3  Q  But it was reported to you by Judge MacLeod?
4  A  MacLeod.
5  Q  And what about the next one, little iii?
6  A  I am not aware of it.
7  Q  You didn't observe that?
8  A  I didn't observe it.
9  Q  If it happened, would that be inappropriate?
10         MS. DEMPSEY: Objection as to form.
11    You can answer.
12 A  No, because we review financial stuff
13    every day, all of us. So I don't think -- oh,
14    for her own dating purposes, I apologize.
15    Wait a minute.
16 Q  Read the rest of the sentence.
17 A  Yes, that would be inappropriate.
18 Q  Was that ever reported to you that you recall?
19 A  No, not that I recall.
20 Q  Little iv?
21 A  I remember I was looking for a car, and
22    Michele actually brought up, I think her car
23    was for sale at whatever the dealership is in

Page 129

1     Littleton, and no, I wouldn't be on it most of
2     the day. I know I wasn't on the internet most
3     of the day. I may have looked at a car
4     online.
5  Q  Okay. Thank you.
6          Do you know who Jay Lynn or
7     Jacqueline is in the court system?
8  A  I don't know who Jay Lynn is. The only
9     Jacqueline is a former employee in Lebanon.
10    There was a Jacqueline there.
11 Q  Do you know what her last name is?
12 A  Messier, M-E-S-S-I-E-R.
13 Q  And what was her position?
14 A  Court assistant 2.
15 Q  What is the difference between a court
16    assistant 1 and court assistant 2?
17 A  There are no 1s. You start out as a 2.
18 Q  You are a 2, and then you are a deputy clerk?
19 A  You are really a 2 forever.
20 Q  You still feel like a 2 at times?
21         There really was no difference?
22 A  I don't know. In my experience, I have never
23    seen a court assistant 1. I have only seen a

33 (Pages 126 to 129)

1      ERRATA SHEET AND CERTIFICATE OF WITNESS

2        In accordance with the rules of procedure
governing depositions, you are entitled to read and
3  correct your deposition transcript.  Please read
your deposition, and on this errata sheet make any
4  necessary corrections or changes, either in form or
substance.  Identify those corrections/changes by
5  page and line number, stating the change and the
reason.  Please do not mark the actual transcript.
6  (Make extra copies of this sheet if you need to
indicate more changes or corrections than will fit
7  on this one page.)  When completed, date and sign
the errata sheet and have your signature notarized.

8

9        I, MICHELLE BROWN, do hereby certify that I
have read the foregoing transcript of my testimony,
10  and further certify that it is a true and accurate
record of my testimony given on October 22, 2012,
11  (with the exception of the corrections listed
below):

12  PAGE    LINE    CORRECTION AND REASON FOR CORRECTION

13   53      5     My answer was yes it would be inappropriate

14  ___     ___    _____

15  ___     ___    _____

16  ___     ___    _____

17  ___     ___    _____

18                              _____
                                    MICHELLE BROWN

19  STATE OF  New Hampshire
20  COUNTY OF  Belknap
    Subscribed and sworn to before me this  28th
21  day of  November                    , 2012.

22  _____
    Notary Public        J.P.
23  My commission Expires:  1/25/17

Kelly          Agrees Would be
                Harassment?          Observed

13a
13b
13c
13di
13dii
13e
13f              83-84
13g              yes
13h
13i
13j
13k
13l

14a
14b
14c
14d
14e
14f
14g
14hi
14hii
14hiii
14hiv

83-84                    Ex 3c

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Estate of Michele M. Walker, Charles E. Walker,
Administrator

VS                    NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of
the Courts and State of New Hampshire - NH Second
Circuit Littleton District Division -
Administrative Office of the Courts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF EDWIN W. KELLY

This deposition taken by agreement of counsel
at the Office of the Attorney General, 33 Capitol
Street, Concord, New Hampshire, on Wednesday,
November 7, 2012, commencing at 8:52 A.M.

Page 82

```
1        to in my decision as being used.
2            I think that is probably it.
3    Q    And why was your report completed in July as
4        opposed to May or August?
5            MS. DEMPSEY:  Objection as the form.
6        You can answer.
7    A    Until Michele's death, she was out on leave,
8        and I believe that there was still a plan to
9        have another interview with Michele when she
10       was able to have that interview, and so, up
11       until May when she passed away, we would have
12       been waiting for the investigation to conclude
13       after that interview.  Once she died in May,
14       then it was just a question of my being able
15       to find the time to go through the thousand
16       plus pages of transcript and reach a decision.
17   Q    Did you write that report yourself?
18   A    I did.
19   Q    Both of them?
20   A    Yes.
21   Q    Do you recall any other situations in the last
22       five years where you have had to move a
23       court -- move court clerks staff because of
```

Page 83

```
1        problems getting along with others in the
2        office?
3    A    None are coming to mind.
4    Q    Do you recall ever having done that?
5    A    I can't remember ever moving anybody from one
6        court location to another, which is not to say
7        it never happened.  Just can't think of any at
8        the moment.
9    Q    I am going to ask you to look at the complaint
10       which we have marked as Knapp 8 and look at
11       paragraph 13, and my question for you is, if
12       all of these things had happened, would you be
13       of the opinion that the environment would be
14       hostile?
15           MS. DEMPSEY:  Objection as to form.
16       You want him to review all of the allegations
17       in 13?
18   Q    Paragraph 13, which goes to the next page,
19       too.
20           MS. DEMPSEY:  If you could indicate
21       when you are done reading everything, and then
22       we can have the question read back.
23   A    Okay.
```

Page 84

```
1            (The record was read.)
2    A    Assuming as well that they were unwelcome and
3        offensive to the person making the complaint,
4        yes.
5    Q    And they would constitute sexual harassment in
6        that circumstance?
7    A    Under our policy, I believe so, yes.
8    Q    Did you have much contact with Michele Walker
9        other than -- well, let me ask.
10           Did you have much contact with her
11       during her employment?
12   A    No.
13   Q    Did you ever, I mean, do you occasionally sit
14       in the court where she --
15   A    No, I never did.
16   Q    You were administrator by then?
17   A    Yes.
18   Q    Were you upset that Ms. Walker made her
19       initial complaint in August of 2000 -- strike
20       that.
21           Were you upset that she made the
22       complaint of August 13th by e-mail?
23           MS. DEMPSEY:  Objection as to form.
```

Page 85

```
1        You can answer.
2    A    No, not at all.  I was concerned.
3    Q    I want to ask you if you have seen Kozlowski
4        11 before, which is the binder journal of
5        Michele's?
6    A    I believe I have.
7    Q    Do you recall if you reviewed that before you
8        did your report?
9    A    I don't recall as I am sitting here, but I did
10       carefully in the report indicate, I believe,
11       everything I did review in the report.  So if
12       it is not in that opening paragraph, I didn't
13       use it in the report.
14   Q    Kozlowski 12, handwritten notes, the personal
15       notes written from July 1st through August 13?
16   A    I don't have a recollection of having seen
17       these.
18   Q    And if you had, it would be -- and you
19       considered it, it would be referenced in your
20       report?
21   A    Yes.
22   Q    And what we have marked as Kozlowski 13, I
23       think this is the -- can you identify if this
```

22 (Pages 82 to 85)

EDWIN W. KELLY   November 7, 2012

Page 138

1   report about her to the state police?
2       MS. DEMPSEY:  Objection as to form.
3   You can answer.
4   A   I am concerned that the facts that at that
5       point I had believed were unfounded were
6       reported to the state police that it might
7       have the effect of defaming an employee in the
8       court.
9   Q   Or it could lead to credibility to Michele's
10      fear, correct?
11  A   No.  A report to the state police, you mean?
12  Q   Right.
13  A   No, I don't think that lends credibility to
14      anybody's fear, necessarily.
15  Q   After Michele made the report on November 9th,
16      2009, were you even more set in your mind that
17      you wanted to continue on a
18      disciplinary/termination track?
19  A   I think at that point, it was clear to me that
20      there were a lot of things going on there that
21      I was not aware of based upon the August 13th
22      e-mail, and that we needed to get to the
23      bottom of exactly what it was.

Page 139

1   Q   Do you recall having any discussions with
2       anyone after -- other than counsel, after the
3       November 9th letter about terminating Michele?
4   A   Other than -- I don't have any specific
5       recollection of a conversation with anyone.
6       However, as these things go, it certainly
7       would have continued to be on the table absent
8       further explanation.  Not that it was
9       concluded.  Not that that is what we would
10      have done, but it certainly would have been
11      something that was on the table.
12          MS. JOHNSON:  That is all I have.
13          (TIME NOTED:  12:33 PM)
14
15
16
17
18
19
20
21
22
23

Page 140

1       ERRATA SHEET AND CERTIFICATE OF WITNESS
2       In accordance with the rules of procedure
3   governing depositions, you are entitled to read and
    correct your deposition transcript.  Please read
    your deposition, and on this errata sheet make any
4   necessary corrections or changes, either in form or
    substance.  Identify those corrections/changes by
5   page and line number, stating the change and the
    reason.  Please do not mark the actual transcript.
6   (Make extra copies of this sheet if you need to
    indicate more changes or corrections listed
7   on this one page.)  When completed, date and sign
    the errata sheet and have your signature notarized.
8
        I, EDWIN W. KELLY, do hereby certify that I
9   have read the foregoing transcript of my testimony,
    and further certify that it is a true and accurate
10  record of my testimony given on November 7, 2012,
    (with the exception of the corrections listed
11  below):
12  PAGE  LINE   CORRECTION AND REASON FOR CORRECTION
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
                _____
                    EDWIN W. KELLY
19  STATE OF _____
20  COUNTY OF _____
    Subscribed and sworn to before me this _____
21  day of _____, 2012.
22  _____
    Notary Public_____J.P._____
23  My commission Expires:_____

Page 141

1
2           C E R T I F I C A T E
3       I, Rebecca Lynn Metea, a Licensed Court
4   Reporter, in and for the State of New Hampshire, do
5   hereby certify that the foregoing is a true and
6   accurate transcript of my stenographic notes of the
7   deposition of EDWIN W. KELLY, who was first duly
8   sworn, taken at the place and on the date
9   hereinbefore set forth.
10      I further certify that I am neither counsel
11  for nor related to or employed by any of the
12  parties to the action in which this deposition was
13  taken, and further that I am not a relative or
14  employee of any attorney or counsel employed in
15  this case, nor am I financially interested in this
16  action.
17
18
19
            _____
20          Rebecca Lynn Metea
            Licensed Court Reporter
21          Certificate Number 39
22
23

36 (Pages 138 to 141)

Knapp

| | Knowledge | Observed |
|---|---|---|
| 13a | | |
| 13b | | |
| 13c | | |
| 13di | | |
| 13dii | | |
| 13e | 147-148 | |
| 13f | | |
| 13g | | |
| 13h | 148 | 148 |
| 13i | 149 | |
| 13j | 150 | |
| 13k | 150-151 | |
| 13l | | |
| | | |
| 14a | | |
| 14b | | |
| 14c | | |
| 14d | 98-103 | 98-103 |
| 14e | | |
| 14f | | |
| 14g | | |
| 14hi | 89-96 | |
| 14hii | 65,66 | |
| 14hiii | | |
| 14hiv | 153 | |

146-153

Ex 3D

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Estate of Michele M. Walker, Charles E. Walker,
Administrator

VS                    NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of
the Courts and State of New Hampshire - NH Second
Circuit Littleton District Division -
Administrative Office of the Courts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF BRENDA KNAPP

This deposition taken by agreement of counsel
at the Office of the Attorney General, 33 Capitol
Street, Concord, New Hampshire, on Friday,
October 19, 2012, commencing at 9:05 A.M.

1    A    There were a lot of complaints.  Michele did

2         not get along with Lisa, and honestly, I don't

3         know the list.  I mean, it would go on and on.

4    Q    Do you remember any of the things that Michele

5         would complain about with respect to Lisa?

6    A    Yes.  One day, Judge Macleod was there, and

7         there was discussion about Lisa, her attorney

8         was there, and she was talking about her

9         divorce, and I know that was an issue.  I

10        don't know all the details, because I think

11        that was with Judge Macleod and Michele.

12   Q    Were you there at the time of that

13        conversation?

14   A    I was there that day.

15   Q    Did you overhear the conversation?

16   A    No, I am sorry.

17             Did you ever overhear the

18        conversation that Lisa had with her counsel?

19   A    No, as to what they were saying, I didn't

20        know.  I didn't hear it.

21   Q    You saw the conversation occur from a

22        distance?

23   A    I couldn't see them even from my desk.  It was

1    just Michele had mentioned that, had said

2    Judge Macleod -- I don't know if the judge

3    heard her.  Judge Macleod was there that day.

4    I don't know who heard Lisa, or if it was him

5    or her or Michele.  There was discussion about

6    her, talking about her divorce while her

7    counsel was at the window.

8  Q   And the discussion was between Judge Macleod

9      and Michele?

10 A   Right.  Yes.

11 Q   And do you know whether Michele and Judge

12     Macleod thought that was inappropriate?

13 A   Yes.

14 Q   Do you know how Michele dealt with it?

15 A   I don't.

16 Q   What other complaints do you remember that

17     Michele had about Lisa?

18 A   As far as specifics, I don't remember

19     specifics.  I do remember Michele saying she

20     was bad.  She should never have gotten the

21     job, that kind of thing, but as far as

22     specifics, I don't recall.

23 Q   In this office that is shown in the pictures,

1  A    No.   I am just trying to think here -- If I go

2        in.   You can see what is entered by the name

3        of the document into --

4  Q    And you don't remember who told you about the

5        petition dealing with running Tammy off the

6        road?

7  A    No.

8  Q    Could it have been Michele?

9  A    Yes.

10 Q    Did -- you don't remember Michele telling you?

11 A    No.

12 Q    Do you remember a complaint that Lisa had

13       taken -- do you remember a complaint that Lisa

14       had said she took her son to spray paint her

15       ex's car?

16 A    No, not spray paint.

17 Q    What was it?

18 A    I don't know if he had soap.   I just remember

19       there being conversations about him wanting to

20       write on his father's car or something.   I

21       don't know if it was soap or what it was.   It

22       wasn't paint.   Whatever it was would wash off.

23                 I just remember thinking, just

BRENDA KNAPP          October 19, 2012

Page 90

```
 1    hearing that. I don't remember that she took
 2    him either. I know she was -- I think Lisa
 3    mentioned it.
 4  Q  That she was thinking of doing that?
 5         MS. DEMPSEY: Objection as to form.
 6    You can answer.
 7  A  No. I remember the conversation being that
 8    the father wouldn't acknowledge the kids if
 9    his girlfriend was with him, and he wanted to
10    write -- I don't even know what he was going
11    to write on his father's car.
12  Q  Lisa was thinking about taking him?
13  A  I don't know if Lisa was going to take him. I
14    don't know if she picked him up. I don't
15    remember that part.
16  Q  Do you remember Michele telling you about
17    that?
18  A  I thought there was a little discussion in the
19    office. I don't know if Lisa was telling us
20    something about it or Michele -- I remembered
21    the incident being discussed.
22  Q  Do you remember Michele talking about it being
23    inappropriate?
```

Page 91

```
 1  A  Oh, yes.
 2  Q  Did she talk about that in front of Lisa or
 3    just to you?
 4  A  I don't remember.
 5  Q  And did you agree that it was inappropriate if
 6    Lisa were to do that with her son?
 7  A  Yes.
 8  Q  It wouldn't reflect good on the court, would
 9    it?
10         MS. DEMPSEY: Objection as to form.
11    You can answer.
12  A  Correct.
13  Q  Did Michele seem to be upset about Lisa
14    mentioning this activity?
15  A  My recollection was maybe some discussion. I
16    don't remember it --
17  Q  Do you remember if Michele reported that to
18    Ms. Brown?
19  A  I have no idea.
20  Q  Do you remember what time period that was?
21  A  I don't --
22  Q  The question is, do you remember what time
23    period?
```

Page 92

```
 1  A  I think it was when he was seeing Tracy Ash,
 2    because I think that was the girlfriend, but I
 3    am not 100 percent sure.
 4  Q  Yes, I don't know what time period that is.
 5    How long would you say that Michele left work
 6    that that was an occurrence?
 7  A  I don't know.
 8  Q  Do you remember when Lisa started?
 9  A  I don't. The year?
10  Q  I know --
11  A  Let's see, I don't know the year. It was Lynn
12    Pucillo, and then -- I think we had floaters
13    for a little while.
14  Q  Lynn who?
15  A  Pucillo. She was there when I went there,
16    family division.
17  Q  How do you spell that?
18  A  P-U-C-I-L-L-O.
19  Q  She was in family division when you got there?
20  A  Yes, and then she left, and it was, I think
21    Linda Gray covered for a while. It seems like
22    somebody else was in there covering, too, but
23    I can't remember who, and then they hired
```

Page 93

```
 1    Audrey Thoreau, and I think Lisa was after
 2    Audrey. This is my best recollection.
 3  Q  I know it has been awhile, so I am not going
 4    to hold you to the exact chronology.
 5         How long would you say Lisa worked
 6    there while Michele worked there?
 7  A  I don't know. I don't know how long Lisa
 8    was -- when she started, specifically.
 9  Q  Would you say it was at least year, year and a
10    half?
11  A  You know, I don't know. I would have to have
12    all the stuff in front of me and research it.
13  Q  That is okay. Thanks.
14         Did Michele seem concerned about the
15    allegations against Lisa, the stalking
16    petitions, the running the car off the road,
17    the going to spray paint -- not spray paint,
18    going to do something to somebody's car?
19  A  Yes.
20  Q  Did she tell you that?
21  A  Yes, she didn't -- she was not liking it, and
22    it shouldn't be happening.
23  Q  Did she seem -- did she tell you she thought
```

24 (Pages 90 to 93)

BRENDA KNAPP      October 19, 2012

Page 94

1   Lisa was unstable or untrustworthy, or what
2   did she tell you about Lisa?
3   A   Honestly, the list, I don't know specifics.  I
4       mean it was just a general, Lisa shouldn't
5       have the job.  Somebody else should have the
6       job.  She is not good enough for it.
7       Whatever.  Specific words, I don't know, it
8       was just a given.
9   Q   Just taking the incident with yelling at her
10      daughter, Lisa yelling at her daughter off the
11      fire escape, and the son, with whatever was
12      going on with the car, in your opinion, did
13      that make Lisa someone who was not really a
14      desirable court clerk?
15          MS. DEMPSEY:  Objection to form.
16      You can answer.
17  A   First of all, assuming that that is the whole
18      story and those are true, of course not.  You
19      don't behave that way, but again, the daughter
20      thing on the fire escape, I don't remember if
21      the answer to that was that they weren't
22      arguing, they were trying to talk over the
23      noise to see what the girl wanted or was

Page 95

1   asking for, or something like that.  I don't
2   recall the whole story, but to answer that
3   question, you know, it would be assuming
4   everything was true.
5   Q   Okay.  Do you think you heard that excuse, it
6       was noisy, from Lisa?
7   A   I don't know if it was Lisa talking to Michele
8       even about it, because I think Michele may
9       have said something to her.  I am not sure at
10      the time when she came back in or something.
11      Honestly, I don't remember.
12  Q   Don't you think if it was noisy on the fire
13      escape, that they would talk inside?
14          MS. DEMPSEY:  Objection to form.
15      You can answer.
16  A   The daughter wasn't in the building.
17  Q   So the daughter was not on the fire escape?
18  A   My understanding, and again, I wasn't there.
19      I didn't see it.  I thought the daughter, from
20      what I had heard from them, was down on the
21      ground level.
22  Q   Okay.  That makes a little more sense.
23          So if only the incident was accurate

Page 96

1   about Lisa taking her son to do something to
2   her ex's car, would you still think that is
3   inappropriate?
4   A   Absolutely.
5          MS. DEMPSEY:  Wait for the question.
6   Q   I know.  Let me ask it again.
7          If only the incident was true about
8   Lisa taking her son to do something to her
9   ex's car, would you think that that would
10  reflect badly on her as a court employee?
11          MS. DEMPSEY:  Objection to form.
12      You can answer.
13  A   Yes.
14  Q   And Lisa herself talked about doing something
15      with her ex's car and her son, correct?
16  A   There was an incident, and again, I don't know
17      if she took the boy, if she picked the boy up
18      or whatever.  I don't recall the details, but
19      there was something about that, yes.
20  Q   Do you think that incident could be deemed to
21      be something that shows that Lisa is not
22      stable?
23          MS. DEMPSEY:  Objection to form.

Page 97

1   You can answer.
2   A   Well, I would not think that anyone would do
3       that.  I mean, I don't know what else to say.
4       I mean, that is just not acceptable.  You
5       don't do that.
6   Q   I am going to forget her last name.
7          Were you at Martha's birthday party
8   in 2009?
9   A   Yes.
10  Q   What is her last name?
11  A   Kennett.
12  Q   K-E-N-N-E-T?
13  A   -- T.
14  Q   You were at her birthday party?
15  A   Yes.
16  Q   How many people were there?
17  A   Whoever was there that day.  Probably it was a
18      court day.  Martha was there.  I imagine the
19      judge, Martha, myself, Michele, Lisa.  I know
20      Stan was there, and that must have been
21      Chuck's time, too, I am guessing.
22  Q   I don't want you to guess.
23  A   I don't remember.

25 (Pages 94 to 97)

BRENDA KNAPP     October 19, 2012

Page 98

1  Q   You remember Stan though?
2  A   I believe Stan was there.
3  Q   And we are looking at Exhibit 3, where would
4      that --
5  A   Right in chambers.  We always put the cakes on
6      the chamber table.
7  Q   Did you have a kitchen area or anything?
8  A   No.  We got a little microwave on a little
9      stand here, and we used the water in the
10     bathroom here, and --
11 Q   Okay.  And what do you remember about Martha's
12     party that year?
13 A   She turned 50.  There was black.
14 Q   There was black, okay, black streamers?
15 A   Yes, and I remember the whole story about the
16     knives.  And I can't remember if it was
17     Michele that brought it up or Lisa, but Lisa
18     said something about knives, and I am not even
19     remembering how it was phrased, but she had
20     said something about her ex-husband, and I
21     don't know if it was because the child support
22     was late again, or what was going on, but then
23     she made an off-the-cuff comment about a

Page 99

1      knife, like as a joke, in the room, and I
2      think Michele took it to mean Michele, but I
3      am not --
4  Q   What do you remember Lisa saying?
5  A   You know, I don't even remember.  I know she
6      said something about a knife.  How she worded
7      it, and what her intent was, it was something
8      about -- I don't know.  I could use a knife.
9      I don't remember how it was worded.
10 Q   Do you remember something about maybe -- I am
11     going to ask if this is accurate because this
12     is what I have learned in this case is the
13     allegation is that Lisa said she had plenty of
14     knives -- Stan asked if anyone had a knife,
15     and Lisa said something to the effect, I have
16     plenty of knives at home with names on them,
17     something in that regard.
18 A   I don't know.
19 Q   Can you tell me looking at the judge's
20     chambers, and we will both look at it, so the
21     bottom where the sticker is, looking at the
22     judge's chambers, can you -- I will have you
23     draw again, draw where the table -- where the

Page 100

1      judge's desk and the table is, and where
2      people were standing at the time of the
3      comment, if you remember?
4  A   (Witness complied.)
5  Q   So the file cabinets -- I am confused where
6      those are?
7  A   As you walk into chambers.
8  Q   From the district division?
9  A   Right.  The judge's desk is over by the
10     windows.  The chamber table kind of hooks onto
11     his desk and goes directly across the room,
12     big table.  The little table that we have that
13     holds up the microwave and coffee cups and all
14     of that is right here next to the door that
15     goes into the courtroom, and then on the other
16     side of the table are two file cabinets.
17 Q   Before you get done with that, do you know if
18     the knife comment was made where people were?
19 A   I don't.  Everybody was just around the table,
20     waiting for cake.
21 Q   You said you remember -- well, you believe
22     Michele thought the comment was about her.
23         What makes you say that?

Page 101

1  A   I don't remember if Michele said something or
2      Lisa said something or even when it was or if
3      it was from this investigation, but that is my
4      recollection.
5  Q   Is that Michele thought it was about her?
6  A   Right.
7  Q   And you don't remember if Michele talked to
8      you about that or if you just learned it in
9      the investigation?
10 A   Right.  It has been very difficult trying to
11     remember separate what was then and what you
12     have learned.
13 Q   Do you remember talking to the investigator
14     about the knife incident?
15 A   No.
16 Q   Let me clarify that.  Were you -- do you
17     remember being interviewed by Paula Hurley
18     about the knife incident?
19 A   Paula did call and ask questions, and was that
20     a specific question, I don't remember.
21 Q   But if she asked you about it, you would have
22     told her, about the knife comment?
23 A   Yes.

BRENDA KNAPP          October 19, 2012

Page 102

1  Q   Do you remember being asked about it with
2      Christine Howe during that investigation?
3  A   Yes.
4  Q   And do you remember saying -- do you remember
5      saying the same thing you said today?
6  A   I don't remember. I would have to look again.
7  Q   And do you remember anyone else, other than
8      Paula Hurley or Christine Howe and myself and
9      maybe counsel, asking you about the knife
10     incident?
11 A   I don't know. I don't know if Michele ever
12     did or Lisa, I don't know.
13 Q   Do you remember approximately when that was
14     that this knife incident occurred?
15 A   Let's see, it was a July date because it is
16     Martha's birthday.
17 Q   I will tell you Michele filed her first
18     complaint August 13th?
19 A   All right. It must have been July just before
20     then.
21 Q   So it would be probably towards the end of
22     July, Martha's birthday?
23 A   I think Martha is a Cancer. That would put

Page 103

1      her towards the front.
2  Q   I have no idea. I know when Taurus is and
3      Pisces.
4  A   That is my recollection.
5  Q   Can't help you on that one.
6          Whenever Martha's birthday is, that
7      was the knife incident?
8  A   At least her celebration, if she was at the
9      court on her birthday.
10 Q   After that knife incident, did you notice
11     anything different about Michele?
12 A   No.
13 Q   Do you recall Michele ever telling you she was
14     afraid of Lisa?
15 A   No.
16 Q   You don't recall though all the complaints
17     that Michele had about Lisa?
18 A   Like I said, it was ongoing. It was just a
19     way of life.
20 Q   You worked with Michele since 2000?
21 A   Uh-huh.
22 Q   Yes?
23 A   Yes.

Page 104

1  Q   Had she ever had voluminous complaints about
2      any other employee?
3  A   Yes, a lot of it was the family division.
4  Q   Well, when Michele started there, they had a
5      family division, right?
6  A   Right.
7  Q   It wasn't something that was new and imposed
8      on her, as far as you know?
9  A   No, wait, when Michele started there, it was
10     just district court. While she was there, I
11     am pretty sure, it was while she was there
12     that me moved family court in.
13 Q   That is when she moved file cabinets and
14     decorated?
15 A   No, that is when the pilot program started
16     with family division. The whole remodeling,
17     this whole thing, was later. Family division
18     had been in with district court for many
19     years.
20 Q   Okay. So when Michele started, family
21     division was in with district court? It
22     wasn't like there was no family division?
23 A   I think when she started at the court, I think

Page 105

1      that there was no family division. I think
2      everything was still in superior court,
3      because I remember her telling me about some
4      of the file cabinets that family was using
5      were actually the district ones, but they had
6      been given to family when they were moved in
7      to begin their pilot program.
8  Q   What other employee did Michele ever have a
9      lot of complaints about?
10 A   Like I say, it was -- trying to move family in
11     and squeeze everybody in was tight, so you
12     know there were -- if they weren't as busy as
13     we were, and you know, could they do some of
14     our work, too. There were always these little
15     things going on between the divisions.
16 Q   But that is different than having a complaint
17     up against one specific individual on a
18     routine basis, right? As I understand it, you
19     are saying Michele had some complaints about
20     meshing the two and dividing the two?
21 A   Right.
22 Q   But was there any particular employee other
23     than Lisa Towle that she routinely complained

27 (Pages 102 to 105)

1      should say, and ask you if -- well, have you

2      ever seen the complaint before, and I am going

3      to have one marked as Exhibit 8.

4                    (Whereupon, the court reporter

5      marked Exhibit Number 8, Complaint, for

6      Identification.)

7  Q   Let me switch documents with you since she has

8      marked mine.  My question is, have you ever

9      seen this before?

10 A   It looks like the same thing.

11 Q   The same thing as what?

12 A   That I have seen.

13 Q   That you have seen since your interviews, not

14     at your interviews, right?  This is dated

15     August 2011?

16 A   Yes.

17 Q   I would like you to turn to page 4.

18            I would like you to start from

19     paragraph 13 and just read through there and

20     tell me as you go through each numbered letter

21     whether you know anything about what is listed

22     in that letter or number.  So for example, if

23     you read 13 and there is nothing there --

Page 146

1    MS. DEMPSEY:  13 up to A?
2    MS. JOHNSON:  I am asking her to
3  read, starting at number 13 and read through
4  and tell me when she gets to any part that she
5  has any factual information about.
6    MS. DEMPSEY:  Objection as to form.
7  Q  We can start with 13A?
8  A  It is absolutely not.
9  Q  I can ask each one, individually, but I would
10   ask if you read the next one to yourself and
11   read through it and tell me if any of those
12   things you have any information about
13   happening?
14  A  Okay. B, absolutely not. C, absolutely not.
15   D, no. No. E, no. F, I am reading that as
16   if I thought she was ever offended? I would
17   say, no.
18  Q  I am asking whether there were any sexually
19   offensive jokes.
20  A  Offensive. There has been banter, but I don't
21   recall anyone thinking that it was
22   over-the-top type of offensive. I think it is
23   important that that be understood.

Page 147

1  Q  What kinds of banter do you recall?
2  A  Specifics? You know, I don't know the
3   specific things. I mean it was just -- every
4   once in a while, as a joke or an e-mail or
5   something, that is not gross, but I mean, was
6   there sexual comments made occasionally, yes.
7   I don't recall specifics.
8  Q  Do you remember ever being offended by any
9   sexual comments at work?
10  A  There really weren't -- No, I don't.
11  Q  Let me back you up to E for a minute. I think
12   you took a second, a couple seconds to think
13   about that.
14    Do you remember Michelle Brown
15   talking about a judge in that manner at all?
16    MS. DEMPSEY:  Objection to form.
17   You can answer.
18  A  Well, I remember the day that there was
19   discussion about Judge Macleod's underwear.
20  Q  Do you remember when that was?
21  A  No.
22  Q  Do you remember who said what?
23  A  Specifically, no, but I know Michelle Brown

Page 148

1   was there that day.
2  Q  Do you think it was her that made the comment?
3  A  Could have been.
4  Q  Where does she work now?
5  A  Laconia, I think, yes. She is the clerk.
6  Q  Do you remember any other comments that
7   Ms. Brown made about the judge?
8  A  No. I mean specifically, no.
9  Q  G.
10  A  No.
11  Q  H?
12  A  Yes, I remember that phone call came in.
13  Q  And tell me about that.
14  A  Michele Walker answered the phone that day,
15   and this is what she told me he said, and that
16   he hung up.
17  Q  You observed her answer the phone?
18  A  Yes.
19  Q  And did she seem offended to you?
20  A  She didn't like it. She thought it was --
21  Q  She thought it was what?
22  A  Inappropriate.
23  Q  Do you know if she reported that to Michelle

Page 149

1   Brown?
2  A  I think she might have.
3  Q  Was Lisa Towle in the office that day?
4  A  No. My recollection it was just Michele
5   Walker and I, and that was why she answered
6   the phone.
7  Q  Okay. And I?
8  A  I remember there was an e-mail that Lynn sent
9   that went to Madeline Walker.
10  Q  And do you remember what was in the e-mail?
11  A  I don't. I know that it was offensive to her,
12   but I don't remember what it was.
13  Q  Do you remember if you were offended by it?
14  A  I don't even remember the e-mail to be honest
15   with you.
16  Q  Do you remember if Michele reported to you she
17   was offended by it?
18  A  Michele was not happy that Madeline Walker had
19   gotten it.
20  Q  And Madeline called Michele upset that she had
21   gotten it, right?
22  A  Called or e-mailed or something, yes. There
23   was some kind of response from Madeline

38 (Pages 146 to 149)

BRENDA KNAPP          October 19, 2012

Page 150

1      Walker.
2    Q   And that was at some point when -- the e-mail
3        address got messed up with the same initials?
4    A   Right.
5    Q   And J.
6    A   I remember there being discussion that Michele
7        Walker -- I know Brown did go out to lunch
8        with her boyfriend, I believe, and I think she
9        did have a different shirt on when she came
10       back, but I don't know her and Michele
11       Walker's discussion on it.
12   Q   You weren't privy to that?
13   A   I don't recall, no.
14   Q   Do you remember --
15   A   I know she did go to lunch with him, but I
16       don't --
17   Q   This says in the beginning of 2009, does that
18       sound correct to you or not?
19   A   I don't know.
20   Q   K?
21   A   Yes.
22   Q   You remember that happening?
23   A   I think so, yes.

Page 151

1    Q   So do you remember who was apparently --
2        Michelle Brown made the comment. Michele
3        Walker was there. You were there. Was Lisa
4        there?
5    A   I have no idea.
6    Q   L?
7    A   I don't recall that.
8    Q   Do you remember Michele telling you about it?
9    A   Michele wouldn't, no, we didn't talk about
10       Chuck.
11   Q   So it was off limits, right?
12   A   Right.
13   Q   And then 14A?
14   A   No.
15   Q   You have no personal knowledge of that?
16   A   I cannot imagine it. I don't know that
17       anybody would have dared to do it.
18   Q   B?
19   A   No. That didn't happen.
20   Q   You weren't always there, right?
21   A   Right.
22   Q   And C?
23   A   No.

Page 152

1    Q   And do you have any information about D? We
2        already discussed that. Anything else you
3        have thought about that incident?
4    A   No.
5    Q   E?
6    A   I don't think that happened. I don't recall
7        that at all.
8    Q   Okay. We should be able to get your time
9        cards for that day and see if you were even
10       there, right?
11   A   You can check it, yes.
12   Q   F.
13   A   I don't believe that happened, no.
14   Q   That's not something that Lisa would say in
15       front of you anyway, right?
16   A   I never heard anything like that.
17   Q   G.
18   A   No, I don't believe it.
19   Q   H, and I will say H little i, and that is what
20       we talked about before?
21   A   Right.
22   Q   Do you know if Michele reported that to Judge
23       Cyr and Ms. Brown?

Page 153

1    A   I have no idea.
2    Q   ii?
3    A   We have talked about that as well.
4    Q   Okay. And iii?
5    A   Not to my knowledge at all.
6    Q   That would be inappropriate, right?
7            MS. DEMPSEY: Objection to form.
8        You can answer.
9    A   Yes.
10   Q   I will ask it again, would iii be appropriate?
11   A   No.
12   Q   And number 4?
13   A   I don't know. I remember her looking up cars
14       on the internet one day, but I don't know how
15       long it was.
16   Q   How often was Ms. Brown at the courthouse
17       where you work?
18   A   I don't know what her schedule was. I mean,
19       it seemed -- before she was the supervisor for
20       Lisa, she was a worker. She was Lisa. She
21       came in a few times.
22           I don't know what her schedule was?
23   Q   You said she was Lisa before?

39 (Pages 150 to 153)

BRENDA KNAPP          October 19, 2012          188

```
1          ERRATA SHEET AND CERTIFICATE OF WITNESS

2          In accordance with the rules of procedure
    governing depositions, you are entitled to read and
3   correct your deposition transcript.  Please read
    your deposition, and on this errata sheet make any
4   necessary corrections or changes, either in form or
    substance.  Identify those corrections/changes by
5   page and line number, stating the change and the
    reason.  Please do not mark the actual transcript.
6   (Make extra copies of this sheet if you need to
    indicate more changes or corrections than will fit
7   on this one page.)  When completed, date and sign
    the errata sheet and have your signature notarized.

8
          I, BRENDA KNAPP, do hereby certify that I
9   have read the foregoing transcript of my testimony,
    and further certify that it is a true and accurate
10  record of my testimony given on October 19, 2012,
    (with the exception of the corrections listed
11  below):

12  PAGE      LINE      CORRECTION AND REASON FOR CORRECTION

13   7        13      "You" - You meaning Mary Ann Dempsey
     8         7      "Northrop's" Market
14   8         7      "town" meaning "Lisbon"
     8        14      "He" should be Karl Bruckner
15   8        21      "Gruber" should be "Bruckner"
    50        14      "out of jail" should be "an arraignment"
16  101       11      "remember separate" should be "remember and separate"

17

18                    _____
                          BRENDA KNAPP

19  STATE OF New Hampshire
20  COUNTY OF Grafton
    Subscribed and sworn to before me this  3rd
21  day of  December                    , 2012.

22  _____
    Notary Public        J.P. ✓
23  My commission Expires: 11/16/16
```

| Kozlowski Vol. II | Agrees Would be Harassment? | Observed |
|---|---|---|
| 13a | Y | |
| 13b | Y | |
| 13c | Y | |
| 13di | Neither Y or N | |
| 13dii | Y | |
| 13e | Y | |
| 13f | Y | |
| 13g | Y | |
| 13h | Neither Y or N | |
| 13i | Y | |
| 13j | Neither Y or N | |
| 13k | Y | |
| 13l | Y | |
| | | |
| 14a | Y | |
| 14b | Y | |
| 14c | Neither Y or N | |
| 14d | Y | |
| 14e | Y | |
| 14f | Y | |
| 14g | Y | |
| 14hi | Y | |
| 14hii | Y | |
| 14hiii | Y | |
| 14hiv | Y | |

104-111

Ex 3E

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Estate of Michele M. Walker, Charles E. Walker,

Administrator

VS                       NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of

the Courts and State of New Hampshire - NH Second

Circuit Littleton District Division -

Administrative Office of the Courts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF PAMELA KOZLOWSKI

VOLUME II

This deposition taken by agreement of counsel

at the Office of the Attorney General, 33 Capitol

Street, Concord, New Hampshire, on Friday,

October 26, 2012, commencing at 1:53 P.M.

PAMELA KOZLOWSKI      October 26, 2012

Page 102

1   Q   The November -- the sexual harassment?
2   A   Exactly, that is the first that clued me in to
3       what Michele Walker was alleging.
4   Q   And do you know who Jacqueline is in the court
5       system?
6   A   There was a Jacqueline who worked in the
7       Lebanon Family Division, but I see no
8       connection to those women that Michele Walker
9       has alleged were doing that behavior.
10  Q   And what is Jacqueline's last name?
11  A   Oh, boy.
12  Q   Is it Messier, maybe?
13  A   Yes.
14  Q   And does she still work for the court?
15  A   No.  She left to work for the Vermont court
16      system, and I am not sure if she is still
17      there.
18  Q   Do you know where she lives?
19  A   I think she lived in Vermont, not exactly --
20      in the White River area, but Jacqueline
21      Messier was not friendly with those women.
22  Q   How do you know that?
23  A   Just from -- because I worked in the Lebanon

Page 103

1       office.  Jacqueline Messier was very much to
2       herself.  She was not social with -- you could
3       tell by her demeanor.  She was very
4       introspective or to herself.
5   Q   Are you aware -- have you seen Michele's --
6       any information in this case about Michele
7       alleging that she was told by Lynn Gilman that
8       Lynn, Michelle Brown, would have parties with
9       Jacqueline?
10  A   Only --
11          MS. DEMPSEY:  Objection as to form.
12      You can answer.
13  A   Only what I have read that you have shown me.
14  Q   So you didn't, you weren't aware at the time
15      of that, of that stuff going on?
16  A   Absolutely not.
17  Q   If that was going on, if employees were having
18      sex together, would that be against policy?
19          MS. DEMPSEY:  Objection as to form.
20      You can answer.
21  A   I think what they do outside of work is one
22      thing, but if they were bringing that stuff to
23      work, that would be a violation of policy.

Page 104

1   Q   You mean talking about it?
2   A   Yes.
3   Q   Inviting other people to join in?
4   A   Absolutely.
5   Q   I am going to show you what we marked as Knapp
6       8, which is the complaint in this matter.  We
7       didn't look at this last time, did we?  Did
8       you look at the written complaint?
9   A   I have seen it.  I don't think we went through
10      it last time.
11  Q   Let me have you look at paragraphs 13 and 14,
12      and we will go through it.  Let me ask you --
13  A   13 and 14?
14  Q   Paragraphs 13 and 14.  Paragraph 13, number A,
15      and I will ask you the same question about
16      each one of these, if that occurred in the
17      workplace, would that be in violation of the
18      sexual harassment policy?
19          MS. DEMPSEY:  Objection as to form.
20      You can answer.
21  A   If it occurred?
22  Q   Yes.
23  A   Yes.

Page 105

1   Q   And what about B?
2          MS. DEMPSEY:  Same objection.
3   A   Yes.
4   Q   What about C?
5          MS. DEMPSEY:  Same objection.
6   A   Yes.
7   Q   My question for D is, would comment Number 1
8       be appropriate or inappropriate in the
9       workplace?
10         MS. DEMPSEY:  Objection as to form.
11      You can answer.
12         MS. JOHNSON:  I am going to take
13      exception to the objection as to form.  I
14      mean, coaching --
15         MS. DEMPSEY:  There is no coaching
16      going on.  I am happy to state the objection
17      in greater detail.
18         My objection to the question is it
19      appropriate or inappropriate, that is a vague
20      term, and I object to the form of the
21      question.
22  Q   What is your understanding of the word
23      "inappropriate"?

27 (Pages 102 to 105)

Page 106

1   A   Not acceptable, distasteful.
2   Q   Let's go back to A, that that would not be
3       acceptable to occur in the workplace?
4   A   Yes.
5   Q   And B, would that be acceptable or not
6       acceptable?
7   A   Not acceptable.
8   Q   What about C?
9   A   Not acceptable.
10  Q   How about D1?
11  A   That would have to be taken in context. I
12      can't outright say it is unacceptable.
13  Q   What about 2?
14  A   That would be unacceptable.
15  Q   What about E, and I will give you a moment to
16      read it.
17  A   That would be unacceptable.
18  Q   What about F.
19  A   Unacceptable.
20  Q   What about G.
21  A   Unacceptable.
22  Q   What about H?
23  A   That's a difficult one because it wasn't

Page 107

1       coming -- it wasn't between a co-worker and a
2       co-worker. I am not sure how much control we
3       have over picking up a phone and having that
4       happen. So I can't say with certainty on that
5       one.
6   Q   I, unacceptable or acceptable?
7   A   Unacceptable.
8   Q   Do you know whether the other M. Walker, do
9       you know about her filing a complaint about
10      that e-mail?
11  A   I do not.
12  Q   Do you remember the e-mail?
13  A   I do not.
14      MS. JOHNSON: I am going to ask for
15      a copy of the e-mail from your counselor. I
16      don't believe I have seen it. If I have, I
17      apologize.
18  Q   What about J?
19  A   There is -- someone is making the judgment
20      call that it is insinuating sex. That one
21      should be looked into with some context as
22      well.
23  Q   K?

Page 108

1   A   Unacceptable.
2   Q   How about L?
3   A   Unacceptable.
4   Q   What about -- so now 14 talks about
5       retaliation in a hostile environment, and A,
6       would that be acceptable or unacceptable?
7   A   Assuming this was all true?
8   Q   If it occurred in the workplace, would it be
9       acceptable or unacceptable?
10  A   Unacceptable.
11  Q   B?
12  A   Unacceptable.
13  Q   C?
14  A   A little more context on that one, too, I
15      think.
16  Q   D?
17  A   Unacceptable.
18  Q   E?
19  A   Unacceptable.
20  Q   F.
21  A   Unacceptable.
22  Q   G.
23  A   Unacceptable.

Page 109

1   Q   H, I guess i, and what I am asking, is it
2       appropriate to even talk about that in the
3       workplace?
4       MS. DEMPSEY: Objection as to form.
5       You can answer.
6   A   Unacceptable.
7   Q   In fact, if that event occurred, it would
8       cause you more concerns about Ms. Towle, is
9       that correct?
10      MS. DEMPSEY: Objection as to form.
11      You can answer.
12  A   Yes.
13  Q   Do you understand what is described there to
14      be a criminal act?
15  A   Potentially a criminal act.
16  Q   Criminal mischief for one, correct?
17  A   Possibly, yes.
18  Q   ii?
19  A   Unacceptable.
20  Q   iii?
21  A   If we knew they were doing it for sure for
22      dating purposes, unacceptable.
23  Q   And they would potentially be fired, correct?

28 (Pages 106 to 109)

PAMELA KOZLOWSKI    October 26, 2012

Page 110

1        MS. DEMPSEY: Objection as to form.
2      You can answer.
3    A   I am not sure about fired, but certainly,
4      disciplined would be involved at some level.
5    Q   So that is not something you can definitely
6      say you would fire someone for using personal
7      sealed financial records for dating purposes?
8    A   Correct, I am not sure. I mean, it could. It
9      seems to me it would definitely warrant some
10     form of disciplinary action.
11   Q   In your experience in the court when someone
12     has broken a rule, is there a standard policy
13     of giving verbal warning, written warning?
14         How does that progress?
15   A   Our personnel rules spell that out, and so
16     does the SEA union contract for employees.
17   Q   Depending which type of employee you are?
18   A   Exactly. Much of it is the same in both, but
19     there is a progression. It is a progressive
20     discipline.
21   Q   So someone has a chance to fix their errors?
22   A   Of course, everything is taken on a case by
23     case -- if something were so egregious, I am

Page 111

1      sure someone would be fired, but otherwise, it
2      would be a progressive disciplinary process.
3    Q   And iv?
4    A   If that's true, that would not be acceptable.
5    Q   Done with the complaint. Thank you.
6          Assuming what happened in 13 and 14
7      that we have talked about, happened, and you
8      were the person exposed to that conduct, would
9      you feel that you were in a hostile
10     environment?
11         MS. DEMPSEY: Objection as to form.
12     You can answer.
13   A   Can you show me 13 and 14 again?
14   Q   It is the whole list of things?
15   A   That we just went through?
16   Q   Yes.
17   A   Assuming that were true, and I was on the
18     receiving end of it?
19   Q   Right.
20   A   Yes.
21   Q   And would you feel that it was a hostile
22     environment that included sexual harassment?
23         MS. DEMPSEY: Objection as to form.

Page 112

1      You can answer.
2    A   Yes.
3    Q   You are aware that one of the allegations we
4      just went over is that Michele -- that
5      co-workers invited her to join in a lesbian
6      sexual relationship?
7    A   Yes, that is one of the ones we just read.
8    Q   And we agreed that that was inappropriate, if
9      it occurred?
10   A   Yes.
11   Q   And when you were interviewed by Ms. Howe --
12     talked to, however we want to say it, did she
13     raise her voice to you?
14   A   Ms. Howe?
15   Q   Ms. Howe?
16   A   No, not that I recall.
17   Q   Was she pleasant to you?
18   A   I recall it being a pleasant interview,
19     conversation, yes.
20   Q   Did you understand whether she was an
21     independent investigator?
22   A   I think I understood her role as being engaged
23     by the administrative office of the courts for

Page 113

1      the purpose of an investigation, and I -- she
2      told me she worked for the State of Vermont,
3      but I understood the context in which she was
4      looking into this matter.
5    Q   That the state -- the court system had hired
6      her to interview people and do an
7      investigation?
8    A   Yes, and somehow retained her and engaged her
9      services for the purpose of an internal
10     investigation.
11   Q   Did you ever review the reports of either the
12     Hurley investigation or the Howe investigation
13     that was done by Judge Kelly?
14   A   I have not seen them.
15   Q   Are you aware of Michele Walker's efforts to
16     return to work?
17   A   I am not.
18   Q   Were you ever approached by Judge Kelly about
19     whether Michele should be allowed to return to
20     work at any time?
21   A   No.
22   Q   Is that something that if he was thinking
23     about, or making a decision on, you think he

29 (Pages 110 to 113)

PAMELA KOZLOWSKI      October 26, 2012          145

1                    (TIME NOTED:  05:47 PM)

2        ERRATA SHEET AND CERTIFICATE OF WITNESS

3          In accordance with the rules of procedure
    governing depositions, you are entitled to read and
4   correct your deposition transcript.  Please read
    your deposition, and on this errata sheet make any
5   necessary corrections or changes, either in form or
    substance.  Identify those corrections/changes by
6   page and line number, stating the change and the
    reason.  Please do not mark the actual transcript.
7   (Make extra copies of this sheet if you need to
    indicate more changes or corrections than will fit
8   on this one page.)  When completed, date and sign
    the errata sheet and have your signature notarized.
9
         I, PAMELA KOZLOWSKI, do hereby certify that
10  I have read the foregoing transcript of my
    testimony, and further certify that it is a true
11  and accurate record of my testimony given on
    October 26, 2012, (with the exception of the
12  corrections listed below):

13  PAGE    LINE     CORRECTION AND REASON FOR CORRECTION

14  ____   ____     _____

15  ____   ____     _____

16  ____   ____     _____

17  ____   ____     _____

18                                _Pamela Koz lowski_

19                                  PAMELA KOZLOWSKI

20  STATE OF _New Hampshire_____
    COUNTY OF _Grafton_____
21  Subscribed and sworn to before me this _3rd___
    day of _December_____, 2012.
22
    _Kathy A. Haben_____
23  Notary Public       J.P. _X____
    My commission Expires: _11/30/2016_

MacLeod

| | Knowledge | Observed |
|---|---|---|
| 13a | | |
| 13b | | |
| 13c | | |
| 13di | | |
| 13dii | | |
| 13e | | |
| 13f | | |
| 13g | | |
| 13h | | |
| 13i | | |
| 13j | | |
| 13k | | |
| 13l | | |
| | | |
| 14a | | |
| 14b | | |
| 14c | | |
| 14d | | |
| 14e | | |
| 14f | | |
| 14g | | |
| 14hi | | |
| 14hii | 11,12 | 11,12 |
| 14hiii | | |
| 14hiv | | |
| | | |
| 11-12 | | |

EX 3F

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Estate of Michele M. Walker, Charles E. Walker,
Administrator

VS                    NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of
the Courts and State of New Hampshire - NH Second
Circuit Littleton District Division -
Administrative Office of the Courts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF LAWRENCE A. MACLEOD

This deposition taken by agreement of counsel
at the Office of the Attorney General, 33 Capitol
Street, Concord, New Hampshire, on Wednesday,
November 7, 2012, commencing at 2:28 P.M.

1  A    Just in terms of my own observations, is that

2       what you are asking?

3  Q    No, I am first asking if you ever had any

4       input into an actual review process?

5  A    No, never.

6  Q    Your own observations, what would you say

7       about her work?

8  A    Very competent.

9  Q    What about Lisa Towle?

10 A    I couldn't really say.  I occasionally ran

11      into Lisa up there, I think in Plymouth,

12      sometimes she was there, very minimal

13      interaction.

14 Q    Do you recall an occasion when you approached

15      Michele Walker about a concern you had about

16      Lisa?

17 A    I think I know what you are talking about.  I

18      don't think I approached Michele Walker.  I

19      may have mentioned it to her, but I don't have

20      a memory of that.

21 Q    Do you remember you having an issue about Lisa

22      Towle talking to her lawyer at the window?

23 A    I do.

1  Q  What did you observe?

2  A  To the best of my memory, I observed -- she

3     was -- this is sort of a small -- it was an

4     addition to the courthouse, a family came in.

5     She was there talking to her lawyer about,

6     obviously something had to do with her own

7     litigation, and I was in the room, maybe photo

8     copying or getting something off a printer or

9     something like that.  It struck me as

10    something she shouldn't be doing there under

11    those circumstances.

12 Q  Do you remember mentioning it to Michele

13    Walker?

14 A  I don't remember mentioning it to her.  I

15    could have.

16 Q  Let me show you, just ask you, and this is

17    page 3184 of the AOC production.  If you could

18    read the first paragraph on the top and tell

19    me if this sounds familiar to you?

20 A  Starting where?

21             MS. DEMPSEY:   "At the end of 2008"

22 Q  First paragraph here.

23 A  Beginning "spoke to"?

LAWRENCE A. MACLEOD    November 7, 2012

---

Page 18

1    cover for Judge Zielinski or something.  That
2    may have been.
3        There was another occasion, I think,
4    when my wife was covering for a clerk in
5    Lebanon for Judge Cirone in the district
6    court.  I think I was there that day.  I am
7    not certain.  Maybe just what she told me,
8    because it was awhile ago, but I wouldn't have
9    been working with her directly.
10  Q    You mean she told you --
11  A    I don't know if my memory was correct that I
12    was there the day she was there with Judge
13    Cirone when she was working district court or
14    whether she told me about it.  It was a funny
15    story that happened in the court.  I don't
16    know if I was there -- typically, he and I are
17    not there the same days, but sometimes we
18    overlap.  I may have been there doing family
19    court.
20  Q    I am going to show you what we marked as Brown
21    4.  My question is whether you think that is
22    around the time period you had the
23    conversation with Michelle Brown or not?

---

Page 19

1    A    It could be.  I honestly don't remember the
2        dates or the date that I made this
3        observation, at least until --
4    Q    And have you ever reviewed any of the stalking
5        order petitions or anything with respect to
6        Lisa Towle?
7    A    No.
8    Q    Anytime before this case, were you aware there
9        were any petitions against her?
10   A    I think people have told me that.
11   Q    Who do you think told you that?
12   A    Some court staff.
13   Q    Let me have a minute, please.
14        Did you ever observe any behavior in
15        the clerk's office other than the incident we
16        talked about with Lisa Towle and her attorney
17        that concerned you?
18   A    In Littleton?
19   Q    In Littleton, sorry?
20   A    No.
21   Q    Did you ever hear any sexual jokes while
22        working in Littleton?
23   A    No.

---

Page 20

1        (TIME NOTED:  02:49 PM)
2    ERRATA SHEET AND CERTIFICATE OF WITNESS
3    In accordance with the rules of procedure
     governing depositions, you are entitled to read and
4    correct your deposition transcript.  Please read
     your deposition, and on this errata sheet make any
5    necessary corrections or changes, either in form or
     substance.  Identify those corrections/changes by
6    page and line number, stating the change and the
     reason.  Please do not mark the actual transcript.
7    (Make extra copies of this sheet if you need to
     indicate more changes or corrections than will fit
8    on this one page.)  When completed, date and sign
     the errata sheet and have your signature notarized.
9
     I, LAWRENCE A. MACLEOD, do hereby certify
10   that I have read the foregoing transcript of my
     testimony, and further certify that it is a true
11   and accurate record of my testimony given on
     November 7, 2012, (with the exception of the
12   corrections listed below):
13   PAGE  LINE   CORRECTION AND REASON FOR CORRECTION
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19
20               _____
                 LAWRENCE A. MACLEOD
     STATE OF _____
21   COUNTY OF _____
     Subscribed and sworn to before me this _____
22   day of _____, 2012.
23

---

Page 21

1    My commission Expires:_____
2
3        C E R T I F I C A T E
4        I, Rebecca Lynn Metea, a Licensed Court
5    Reporter, in and for the State of New Hampshire, do
6    hereby certify that the foregoing is a true and
7    accurate transcript of my stenographic notes of the
8    deposition of LAWRENCE A. MACLEOD, who was first
9    duly sworn, taken at the place and on the date
10   hereinbefore set forth.
11       I further certify that I am neither counsel
12   for nor related to or employed by any of the
13   parties to the action in which this deposition was
14   taken, and further that I am not a relative or
15   employee of any attorney or counsel employed in
16   this case, nor am I financially interested in this
17   action.
18
19
20
                 _____
21               Rebecca Lynn Metea
                 Licensed Court Reporter
22               Certificate Number 39
23

Moeckel        Agree it would
               be Hostile?

13a
13b
13c
13di
13dii          Yes, inappropriate)
13e            for Workplace)
13f
13g
13h
13i
13j
13k
13l

14a
14b
14c
14d
14e            Yes - hostile
14f
14g
14hi
14hii
14hiii
14hiv
152-158                    EX 35

Page 1

1                  UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEW HAMPSHIRE

3                     No. 1:11-CV-421-PB

4

5    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
     *                                        *
6    * Estate of Michele M. Walker,           *
     * Charles E. Walker, Administrator       *
7    *                                        *
     *                  vs.                   *
8    *                                        *
     *    State of New Hampshire - AOC,       *
9    *      et al                             *
     *                                        *
10   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11

12

13           DEPOSITION OF JENNIFER S. MOECKEL,

14       taken at the offices of the Attorney General,

15       33 Capitol Street, Concord, New Hampshire,

16       on Friday, March 29, 2013, commencing

17       at 9:45 a.m.

18

19

20

21

22

23

Page 150

1    sentence says, "The report also appropriately
2    includes remedial action to be taken, addressing
3    staff about inappropriate comments."
4        So I guess you got that from the Kelly
5    report, correct?
6  A.  Yes.  What I was referring to there was that Judge
7    Kelly indicated in his report that he thought --
8    this is not a quote.  I don't recall his exact
9    words, but in general that either he was going to,
10   or was going to ask someone to address with staff
11   some of the banter that had occurred in the
12   workplace.
13 Q.  Do you know if in fact that was done?
14 A.  I don't know one way or another.
15 Q.  Do you know why Judge Kelly finished the report
16   since Michele was already dead?
17 A.  I would have to speculate.
18 Q.  What's your -- Go ahead and speculate?
19 A.  If I were to speculate, I would speculate that
20   because the employer had taken this matter so
21   seriously and had this very thorough and lengthy
22   investigation conducted that it would be a shame
23   not to have the conclusions reached and to have

Page 151

1    the benefit of that information so that there
2    could be finality to the sense -- I don't know if
3    that's the word exactly that I want, but to bring
4    the matter to a close and reach whatever
5    conclusions needed to be reached.
6  Q.  Unfortunately that had to happen without finishing
7    Ms. Walker's interviews?
8  A.  That's very unfortunate, yes.  Unfortunate, I'm
9    referring to the sadness to the end of her life.
10 Q.  Thank you.  Yes.  I'm going to ask you to take a
11   look at the complaint.  We're going to mark it as
12   Exhibit 9, I think.
13      (Moeckel Exhibit 9 marked for I.D.)
14 Q.  (BY MS. JOHNSON)  Are you familiar with the
15   complaint relatively?
16 A.  I have read it.
17 Q.  Okay.  Paragraph 13, those allegations in
18   Paragraph 13, would you agree with me that if
19   those things actually had happened that that might
20   be an environment that was hostile or sexually --
21   excuse me -- that that might be a hostile
22   environment?
23      MS. DEMPSEY:  Objection as to form.  You can

Page 152

1    answer.
2  Q.  (BY MS. JOHNSON)  Take your time to read 13.
3      (Pause)
4      Actually read 13 and 14.
5      (Discussion without record.)
6      (Recessed at 2:35 p.m.)
7      (Reconvening at 2:38 p.m.)
8  Q.  (BY MS. JOHNSON)  Okay, back to No. 13.  If the
9    things alleged in Paragraph 13 and its subparts
10   had happened, would you agree that that could
11   constitute a hostile environment based on sex?
12      MS. DEMPSEY:  If some parts had happened is
13   the question?
14 Q.  (BY MS. JOHNSON)  If they -- well, for starters,
15   if they all happened?
16 A.  If I assume that all of these things happened as
17   alleged?
18 Q.  Right.
19 A.  Then yes, it could constitute a hostile
20   environment.  I'd want more information, but it
21   could.
22 Q.  And I'm just going to throw out a number.  If half
23   of them had happened, would that constitute the

Page 153

1    same type of environment?
2  A.  It might depending which half.  And I'm not trying
3    to be flip.
4  Q.  The more severe one's you're agreeing to if they
5    had happened?
6  A.  Yah, I'm struggling with the percentage piece, but
7    some of the allegations are severe certainly.
8    Although I don't even know.  I might back off of
9    the use of the word severe because I don't know if
10   I have enough information.
11 Q.  It could also be pervasive?
12 A.  Right.  The legal standard is severe or pervasive.
13 Q.  I'll just ask you to read them to yourself.  Are
14   any of these incidents that are alleged in
15   Paragraph 13 and its subparts, any of them
16   appropriate to be in the workplace?
17      (Pause)
18 A.  I don't view these as workplace appropriate
19   behavior.  And I say that not in the legal sense
20   because the legal standard is high but, you know,
21   these are not -- they're not good workplace
22   behavior.
23 Q.  Is it fair to assume that these are some of the

Page 154

1 behaviors that Judge Kelly wanted in place to be
2 warned about as far as the banter in the
3 workplace?
4     MS. DEMPSEY: Objection as to form. You can
5 answer.
6     THE WITNESS: My recollection of Judge
7 Kelly's report is that he wanted to address or
8 have someone address -- and I'm not clear on who
9 was to address the banter that occurred in the
10 workplace. My recollection of the report is that
11 there was a finding that there were, there was
12 some mutually engaged in banter or joking and he
13 wanted that addressed.
14 Q. (BY MS. JOHNSON) Well, it's fair to say he wanted
15 any of that type of thing addressed, whether it
16 was mutual or not, correct?
17     MS. DEMPSEY: Objection as to form. You can
18 answer.
19     THE WITNESS: I guess my recollection of the
20 report isn't that specific.
21 Q. (BY MS. JOHNSON) Okay.
22 A. But my opinion, what I'm saying is based on the
23 report, so whatever the report says would govern

Page 155

1 my question.
2 Q. All right. And Paragraph, the same question, is
3 any of the behavior described in 14 and its
4 subparts appropriate for the workplace?
5     (Pause)
6 A. There's not an item on the list that I would
7 identify and recommend for workplace behavior.
8 Q. So it would be inappropriate, in other words?
9 A. Yes. I mean there are some things where you would
10 say, well, if I had more information, for example,
11 g, which alleges that Towle approached plaintiff
12 on at least three occasions that day, yelling and
13 red-faced. Without knowing what was making her
14 angry, I mean if there was something that had been
15 upsetting, you know, there were --
16 Q. Right, if someone was sick or injured or that kind
17 of thing, but --
18 A. Exactly.
19 Q. But if that was happening with respect to, you
20 know, she didn't -- well, it could go either way,
21 correct, depending on the facts?
22 A. Yes.
23 Q. All right. And of the events in 14, if these

Page 156

1 things had occurred would you agree they would
2 contribute towards a hostile environment?
3 A. I'm hesitating because I think of a hostile
4 environment in terms of behavior directed at
5 someone because of their membership in a legally
6 protected classification, like directed at someone
7 because of their sex, and these behaviors on their
8 face don't appear to be directed at someone
9 because of their sex or other legally protected
10 category.
11 Q. Fair enough. If we just say generally hostile but
12 not based on a protected category, you would agree
13 with me not tending towards hostile environment on
14 a sex based or protected category?
15 A. I would, yah. I mean I would agree that it would
16 not be a workplace that I would choose to apply to
17 work in.
18 Q. It would be uncomfortable if this was going on,
19 correct?
20 A. If it all happened as alleged.
21 Q. Or most of it, correct?
22     MS. DEMPSEY: Objection as to form. You can
23 answer.

Page 157

1     THE WITNESS: Depends which most.
2     MS. JOHNSON: Okay. All right. I'm going to
3 have this marked as No. 10.
4     (Moeckel Exhibit 10 marked for I.D.)
5 Q. (BY MS. JOHNSON) My first question, this
6 November 9th, 2009, complaint, you have seen this
7 before, correct?
8     (Document exhibited to witness.)
9 A. Yes, I have.
10 Q. All right. This was Miss Walker's complaint to
11 Miss Hurley that goes into greater detail on the
12 sexual harassment, correct?
13 A. Correct.
14 Q. Are you aware that as of this time Miss Walker did
15 not know whether or not the investigation was
16 complete?
17     MS. DEMPSEY: Objection as to form. What
18 investigation?
19 Q. (BY MS. JOHNSON) Miss Hurley's investigation?
20 A. I'm just trying to be certain in my own head. I
21 believe that's the case, because I believe she
22 commenced a leave before the results of
23 Ms. Hurley's investigation were shared with her.

Walker v. State of NH-AOC, et al
Deposition of Jennifer S. Moeckel

3/29/13

Page 158

1   Q.   And do you know if in fact Ms. Hurley's
2        investigation was ever shared with her, the
3        results?
4   A.   I don't know the answer.
5   Q.   Okay.  So as far as Miss Walker was apparently
6        concerned when she sent this November 9th
7        complaint the Hurley investigation was ongoing?
8        MS. DEMPSEY:  Objection as to form.
9        THE WITNESS:  Yah, I guess I'm not sure what
10       information she would have had.
11  Q.   (BY MS. JOHNSON)  Okay.  If in fact Miss Walker
12       did not know Miss Hurley had concluded her
13       investigation this complaint as far as Miss Walker
14       was concerned would be then added to the Hurley
15       investigation, correct?
16       MS. DEMPSEY:  Objection as to form.
17       THE WITNESS:  That might be one reasonable
18       assumption for her to make.
19  Q.   I'm going to show you this, which I don't remember
20       where it came from, but I'd ask if you've seen
21       that before?
22       I really don't know the answer to that
23       question.  This will be 11.

Page 159

1        (Moeckel Exhibit 11 marked for I.D.)
2   A.   I don't believe I've seen this before.  I'm not
3        sure if what I have --
4   Q.   We don't need --
5        (Discussion without record.)
6   Q.   (BY MS. JOHNSON)  Have you seen this before?
7   A.   I don't believe I have.
8   Q.   Have you had a chance to read it?
9   A.   So far I've read the first page.
10  Q.   You know what, that's fine.  I don't need to ask
11       you further questions since you haven't seen it.
12       Thanks.
13       Do you think it was important for the -- I
14       think I asked you whether or not it was important
15       for Miss Hurley to review the stalk petitions?
16  A.   You did ask.
17  Q.   And you said no, not necessarily?
18  A.   I think I said either not necessarily or it would
19       depend or something along those lines.
20       MS. JOHNSON:  Can we take five minutes?
21       THE WITNESS:  Sure.
22       (Discussion without record.)
23       (Recessed at 2:51 p.m.)

Page 160

1        (Reconvening at 2:56 p.m.)
2        MS. JOHNSON:  I am all done.  Thank you very
3        much for your participation and answering my
4        questions to the best of your abilities.  Thank
5        you.
6        THE WITNESS:  Thank you.
7        (Deposition concluded at 2:57 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 161

1        Moeckel - 3/29/13
2        E R R A T A   S H E E T
3        In accordance with the rules of procedure
         governing depositions, you are entitled to read
4        and correct your deposition transcript.  Please
         read your deposition and on this errata sheet
5        make any necessary corrections or changes, either
         in form or substance.  Identify those
6        corrections/changes by page and line number,
         stating the change and the reason.  Please do not
7        mark the actual transcript.  (Make extra copies
         of this sheet if you need to indicate more
8        changes or corrections than will fit on this one
         page.)  When completed, date and sign the errata
9        sheet and have your signature notarized:
10  Page/Line      Correction         Reason
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  Date:_____  Signature of Deponent:_____
21       Subscribed and sworn to before me this
         _____ day of _____, 20___.
22
23       _____
             Notary Public/Justice of the Peace

Connelly Reporting & Videoconferencing
(603) 472-5745                    www.nhdepositions.com

Towle     Agrees Would Be
                Harassment?    Observed

| | | |
|---|---|---|
| 13a | Y | |
| 13b | Y | |
| 13c | | |
| 13di | | |
| 13dii | | 146 |
| 13e | | |
| 13f | 153 | 147 |
| 13g | | |
| 13h | | |
| 13i | | |
| 13j | | |
| 13k | | |
| 13l | | |
| | | |
| 14a | | |
| 14b | | |
| 14c | | |
| 14d | | |
| 14e | | |
| 14f | | |
| 14g | | |
| 14hi | | 154 |
| 14hii | | |
| 14hiii | | |
| 14hiv | | 155-156 |

143-152            EX 34

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Estate of Michele M. Walker, Charles E. Walker,
Administrator

VS                          NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of
the Courts and State of New Hampshire - NH Second
Circuit Littleton District Division -
Administrative Office of the Courts

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF LISA TOWLE

      This deposition taken by agreement of counsel
at the Office of the Attorney General, 33 Capitol
Street, Concord, New Hampshire, on Friday,
November 2, 2012, commencing at 8:53 A.M.

| page | Line | | Reason |
|---|---|---|---|
| 79 | 15 | | Remove "and I left " |
| 84 | 16 | | __ s/b left |
| 86 | 21 | | insert after telling "Brenda about ct " |
| 106 | 19 | | at beginning of statement add<br>— and would not stop |
| 118 | 13 | | add to the end — Lord, King, |
| 121 | 17 | | again s/b against |
| 142 | 11 | | insert Judge after law |
| 147 | 10 | | irritated s/b infected |
| 129 | 4 | | employment s/b residence |

12 DEC-7 AM 11: 17
DEPT OF JUSTICE
STATE OF NH

LISA TOWLE          November 2, 2012

Page 142

1 Q  Do you remember Michelle Brown saying she
2    loved Judge MacLeod?
3 A  Yes.
4 Q  What do you remember about that?
5 A  It was part of -- an order had just been
6    issued.  No, I am sorry, I take that back.
7       We had needed him to sign, look at
8    an order because we had an emergency order
9    came in.  And she called down to see if Judge
10   MacLeod could look at it.  She said, oh, I
11   just love MacLeod.  I took it because he was
12   willing to look at the order and take time off
13   from his hearing to look at the order for us.
14      Some judges, if they are busy,
15   wouldn't look at them.  It happens on a daily
16   basis.  If they are overwhelmed with cases,
17   they don't have the time.
18 Q  Do you remember ever telling Stan, the
19   bailiff, jokes?
20      MS. DEMPSEY:  Objection as to form.
21   You can answer.
22 A  I don't recall.
23 Q  Do you ever recall telling him jokes with the

Page 143

1    word "cock" in it?
2 A  No, not that I recall.
3 Q  Is it possible you did, you just don't recall?
4 A  No.
5 Q  Do you recall discussing with Lynn during the
6    work time, about younger men having -- having
7    sex with younger men?
8       MS. DEMPSEY:  Objection as to form.
9    You can answer.
10 A  No.
11 Q  Is it possible you had that discussion, and
12   you just don't recall it?
13      MS. DEMPSEY:  Same objection.  You
14   can answer.
15 A  No.
16 Q  I am going to show you what we have marked as
17   Knapp Exhibit 8, and you have seen this
18   document before?
19 A  Yes.
20 Q  Can you turn to page 4, paragraph 13.  I am
21   just going to go through the lettered
22   paragraphs with you and ask you a couple of
23   questions.

Page 144

1       If you could read A to yourself and
2    then I have a question.  And this is with
3    respect to Michele Walker.  Do you know
4    anything about -- excuse me.
5       Do you have any facts about
6    paragraph A?
7       MS. DEMPSEY:  Objection as to form.
8    You can answer.
9 A  Do I have any --
10 Q  Do you know anything about paragraph A as far
11   as did you witness any such incidents?
12 A  No.
13 Q  And if those happened, would those be
14   inappropriate for the workplace?
15 A  Yes.
16 Q  And B, openly discussing participating in
17   homosexual activities, did you observe that at
18   work?
19 A  No.
20 Q  And would that be inappropriate?
21 A  Yes.
22 Q  And co-workers bringing in pictures of
23   homosexual parties, you said you didn't see

Page 145

1    anything such as that?
2 A  No.
3 Q  The comment, I can still land a guy in his
4    20s, you don't recall hearing that?
5 A  No.
6 Q  And how about, I gave the bailiff a blow job,
7    and he never had it done with a tongue ring
8    before.
9       Did you hear that?
10 A  Are you asking if I heard it in the court?
11 Q  Did you hear that at work?
12 A  No.
13 Q  Did you hear that outside work?
14 A  Yes.
15 Q  And where did you hear that?
16 A  From Lynn.
17 Q  And on what occasion?
18 A  We had gone for a walk.  I don't remember the
19   time frame.
20 Q  So like the break or something?
21 A  Yes.  Lunch break.
22 Q  And did you repeat that to anyone?
23 A  No.

37 (Pages 142 to 145)

LISA TOWLE     November 2, 2012

Page 146

1   Q   She didn't have any problem obviously sharing
2       that with you?
3           MS. DEMPSEY:  Objection as to form.
4       You can answer.
5   A   Correct.
6   Q   E, can you read that to yourself, please?
7       My question is other than what we
8       discussed about Judge MacLeod's underwear, the
9       comment, I love Judge MacLeod, probably that
10      he just looked at this order for me, do you
11      recall any other facts that would pertain to
12      paragraph E?
13  A   No.
14  Q   Next page, please.  F, I think you just talked
15      about, you don't recall any sexually offensive
16      jokes?
17  A   Correct.
18  Q   G, Lynn Gilman lifting up her shift and
19      showing her belly ring to plaintiff and asking
20      if she wanted to see her nipple ring.
21          My question is, did Lynn ever
22      participate -- did Lynn ever show you her
23      belly ring or talk about nipple rings?

Page 147

1   A   Well, at the court?
2   Q   Let's start with at the court?
3   A   No.
4   Q   What about outside the court?
5   A   Yes, I had seen her belly ring.
6   Q   During one of the occasions you went out?
7   A   Because I had just gotten mine done as well.
8       Mine was irritated, so she was showing me what
9       it should look like.  I thought mine was
10      irritated.
11  Q   Was this at someone's house, or where were
12      you?
13  A   Yes, we were at her house.
14  Q   How many times would you say you socialized
15      with Lynn Gilman over the years?
16  A   I am sorry.  How many times have I associated
17      with her?
18  Q   Socialized with her, outside of work?
19  A   We went for a walk all the time on lunch
20      breaks.
21  Q   Outside of work?
22  A   Those two occasions that I previously
23      mentioned.

Page 148

1   Q   When you went to Lynn's house and Miriam was
2       there?
3   A   Yes.
4   Q   And then when was the other occasion?
5   A   I had actually gone to her house, and she went
6       back with me to Laconia to meet another friend
7       of mine, and we went to Laconia bike week.
8   Q   And did Lynn Gilman ever invite you to engage
9       in any type of sexual relationship with her?
10  A   No.
11  Q   I am assuming you did not engage in any sexual
12      relationship with her?
13  A   No.
14  Q   Have you ever engaged in a lesbian
15      relationship?
16  A   No.
17  Q   H, Michele Walker picked up the family
18      division phone to cover for absent co-worker
19      when a male voice said, hi, Mrs. Blow Job.
20      You were good last night.
21          My question is, were you there when
22      that occurred?
23  A   No.

Page 149

1   Q   Do you remember hearing about it at work?
2   A   No.
3   Q   Did you ever hear Michelle Brown talk about
4       it?
5   A   No.
6   Q   Letter I, if you could read that to yourself,
7       please?
8   A   Okay.
9   Q   Do you recall that e-mail?
10  A   I do.
11  Q   And what was it about?
12  A   I don't remember the full content of it.
13  Q   What was the gist of it?
14          MS. DEMPSEY:  Objection as to form.
15      You can answer.
16  A   Honestly, I don't remember even the gist of
17      it.  I remember the situation being that
18      Michele Walker chuckled because she got a
19      response from Madeline Walker.  She said, I
20      bet she has her undies in a bunch over that
21      one.
22  Q   The wrong person had received it?
23  A   Yes.

38 (Pages 146 to 149)

LISA TOWLE     November 2, 2012

Page 150

1   Q   By the way, do you know where Lynn Gilman
2       currently lives?
3   A   I do not.
4   Q   Do you know what town she lives in?
5   A   I do not.
6   Q   State?
7   A   I believe she is in Maine.
8   Q   And do you have an idea where that might be?
9   A   I don't.
10  Q   Do you know if she lived in Maine before?
11  A   I do not. I know that she went up there with
12      her boyfriend who had a house -- Standard?
13  Q   Standish?
14  A   Maybe. Maybe. I know that my daughter and I
15      went up on a Saturday, Friday or Saturday and
16      spent the day with her at the beach and had
17      lunch with her and then had dinner with her
18      and her boyfriend.
19  Q   That is actually a third time you socialized
20      with her?
21  A   Yes, I am sorry. That is correct. I am
22      sorry.
23  Q   Does that stir your memory of any other times?

Page 151

1   A   No.
2   Q   And what was the boyfriend's name at the time?
3   A   I believe it was Rob or is Rob.
4   Q   Do you know what his last name is?
5   A   I don't.
6   Q   Did you ever hear whether there was an
7       administrative complaint filed with respect to
8       the explicit e-mail referenced in paragraph I?
9   A   I do not.
10  Q   J, if you could read that to yourself, please.
11  A   Okay.
12  Q   My question is, you already said you didn't
13      hear the comment made about or insinuating
14      that Michelle Brown had gone home for sex for
15      lunch, you didn't hear anything like that?
16  A   Correct.
17  Q   And your office, we have pictures, but it is a
18      pretty decent-size space, right?
19  A   Yes.
20          MS. DEMPSEY: Objection as to form.
21      You can answer.
22  Q   You can't overhear what everyone is saying
23      from every angle in that room, correct?

Page 152

1   A   Correct.
2   Q   You can have a private conversation in your
3       office if you want to?
4   A   Yes.
5   Q   Also in circuit court, correct?
6   A   Yes.
7   Q   What about K, Brown referring to a New
8       Hampshire state trooper she thought was
9       attractive, stated she just wanted to lick his
10      teeth.
11          Do you recall hearing anything like
12      that?
13  A   No.
14  Q   And do you recall Brown asking the plaintiff
15      if her husband could still get it up?
16  A   I do not.
17  Q   Do you recall anyone talking to Michele Walker
18      about that?
19  A   I do not.
20  Q   What about paragraph 14 -- First of all,
21      things in 13 that we just went through, would
22      you agree if those things happened, those
23      could constitute sexual harassment?

Page 153

1           MS. DEMPSEY: Objection as to form.
2       You can answer.
3   A   Yes.
4   Q   14, these are allegations that Michele has
5       made with respect to the hostile environment,
6       retaliation. In paragraph A, do you admit or
7       deny paragraph A?
8   A   Deny.
9   Q   What about B?
10  A   Denied.
11  Q   What about C?
12  A   Denied.
13  Q   Did you say anything similar to that to
14      Michele about calling her a princess?
15  A   No.
16  Q   What about D? We talked about that. You deny
17      saying that?
18  A   Correct.
19  Q   What about E?
20  A   Denied.
21  Q   But did you tell her not to answer your phone
22      or wait on customers?
23  A   I told them that they didn't have to.

39 (Pages 150 to 153)

LISA TOWLE          November 2, 2012

Page 154

1  Q   So you weren't requesting them not to?
2  A   Correct.
3  Q   But when you got back, you sent an e-mail
4      complaining to Michelle Brown that she had
5      answered your phone, right?
6          MS. DEMPSEY:  Objection as to form.
7      You can answer.
8  A   I believe it was because of the way -- I would
9      have to look at the e-mail, I am sorry.
10 Q   F, can you read that to yourself?
11 A   Denied.
12 Q   What about G?
13 A   Denied.
14 Q   And then H, little i?
15 A   Denied.
16 Q   ii?
17 A   I did discuss the legal order that was given
18     to me by my attorney, with my attorney.
19 Q   And was it in a loud manner?
20 A   No.
21 Q   Do you recall Judge Cyr or Judge MacLeod
22     coming into the area when you were talking to
23     your lawyer?

Page 155

1  A   No.
2  Q   And iii?
3  A   Denied.
4  Q   Except you did date two people who had cases
5      in the family division, right?
6  A   Right, but that is not what that is saying.
7  Q   Okay.  You did date two people whose files you
8      had access to for some time?
9          MS. DEMPSEY:  Objection as to form.
10     You can answer.
11 A   We did discuss that I dated two people that
12     did have cases in the court.
13 Q   You would have had access to their files
14     during that time, correct, that their cases
15     were in court?
16 A   I would have had access to it, but I did not
17     access them for such purposes as dating them.
18 Q   Did you access them for other purposes?
19 A   If it was court-related, yes.
20 Q   What about little iv?
21 A   I do recall Michele looking at a car online.
22     I believe she had been car shopping that
23     weekend and was receiving follow-up calls.

Page 156

1  Q   Do you know how much time she spent doing
2      that?
3  A   I don't recall.
4  Q   Thank you.
5          MS. JOHNSON:  Let's take a three- or
6      four-minute break, and then I will probably
7      have 10 or 15 minutes at the most.
8          (Short recess.)
9  Q   Let me show you this document and have you
10     explain what it is and just explain what it is
11     after you take a look at it, and after we mark
12     it.
13         (Whereupon, the court reporter
14     marked Exhibit Number 20, Copy of napkin with
15     notes, for Identification.)
16 Q   First question is, what is this?
17 A   This is a photocopy of a napkin that was left
18     on my vehicle by my ex-husband, Aldis Wright.
19 Q   And that is in December of '08?
20 A   Yes.
21 Q   This is while the guardianship was going on?
22 A   I don't know if we had applied for
23     guardianship yet.

Page 157

1  Q   This was right before the incident with your
2      lawyer talking with you at the window, right?
3          MS. DEMPSEY:  Objection as to form.
4      You can answer.
5  A   I don't remember the exact date.  So I would
6      have to look at it.  This would have been
7      after that, yes.
8  Q   After the conversation with your lawyer?
9  A   Yes.
10 Q   And that case was the guardianship?
11 A   No, everything was -- the guardianship was
12     dismissed, and then there was nothing going on
13     at that time.
14 Q   So did you know what he wanted to talk to you
15     about?
16 A   No.
17 Q   Did you call him?
18 A   No.
19 Q   Was this during the time when you were
20     complaining that he wasn't seeing the
21     children?
22 A   He didn't see the children a lot.
23 Q   Did it include during this time?

40 (Pages 154 to 157)

LISA TOWLE                November 2, 2012                    181

1          ERRATA SHEET AND CERTIFICATE OF WITNESS

2          In accordance with the rules of procedure
governing depositions, you are entitled to read and
3    correct your deposition transcript.  Please read
your deposition, and on this errata sheet make any
4    necessary corrections or changes, either in form or
substance.  Identify those corrections/changes by
5    page and line number, stating the change and the
reason.  Please do not mark the actual transcript.
6    (Make extra copies of this sheet if you need to
indicate more changes or corrections than will fit
7    on this one page.)  When completed, date and sign
the errata sheet and have your signature notarized.

8

9          I, LISA TOWLE, do hereby certify that I have
read the foregoing transcript of my testimony, and
10   further certify that it is a true and accurate
record of my testimony given on November 2, 2012,
11   (with the exception of the corrections listed
below):

12   PAGE     LINE       CORRECTION AND REASON FOR CORRECTION

13    4        7      Ann s/b Erin
      4        13     Remove as I had asked that physical address
14    ✗               remain confidential.
      10       9      Porfido's Market and Deli
15    14       17     Magistrate s/b administrative
      15       21     Millon s/b Mullen
16    54       15     Wherever you s/b where we
      77       11     Chair s/b desk
17                                              → over

18                    Lisa Towle
                      LISA TOWLE

19

20   STATE OF  New Hampshire
     COUNTY OF  Grafton
     Subscribed and sworn to before me this  5th
21   day of  December                    , 2012.

22   Brenda H Jewett
     Notary Public      J.P.  ✓
23   My commission Expires:  8/08/17