

## AFFIDAVIT OF CHARLES E. WALKER

NOW COMES, Charles E. Walker of 368 Old Franconia Rd., Bethlehem, NH and upon oath states as follows:

1. I am the husband of the late Michele Walker (hereinafter referred to as "Michele"), and the Administrator of her Estate.

2. Michele and I were married on May 26, 2008.

3. Prior to our marriage we were aware that when we did get married, I would no longer be able to work at Michele's worksite, and planned that I would transfer to another Court or find another job.

4. While neither Michele nor I were pleased with the Court's handling of the issue of our marriage, I had been planning that shortly after our marriage I would either relocate to another Court or find another job. Although AOC requested I leave in January 2008, at my request, the Court let me continue to work at Michele's worksite until approximately February 22, 2008, the day before my 65th birthday, which Michele and I appreciated even though it was approximately three months' sooner than Michele and I had originally planned.

5. I did not hold any animosity towards the Court over my having to leave. As far as I know, Michele had only been upset at the way things were handled initially, but that was over well before her complaints of sexual harassment. After I left work at the Court, Michele never expressed any animosity towards the Court to me, due to my leaving work there.

6. Except for the harassment, Michele loved her job. She took much pride in her work and her status in the community. Overall, I believe she was protective of the Court and was always concerned about its reputation.

1

7. Michele told me many times about sexual harassment that was occurring at work after December 2008. I recall her sharing with me that she felt she was being sexually harassed at work, including but not limited to the following, all of which were comments made by either Michele Brown, Lisa Towle, Lyn Gilman, and/or Darcy Stearns, and all of which happened during work hours:

a. Comments about me and my abilities in bed, as I am twenty years older than Michele. One of those comments, and there were several, was: "I wonder if he can still get it up as an old man. Let's ask Michele."

b. Lisa Towle, Michele Brown, and Lyn Gilman would talk about having parties, and sleeping together (lesbian relationships), as well as talking about heterosexual relationships including having extra-marital affairs.

c. Michele Brown made inappropriate comments about Judge MacLeod using sexual innuendos about hamburgers and getting a quarter pounder verses a hamburger. "I'm going to get the big one."

d. While in judge's chambers, or the judges' bathroom, Lyn Gilman wanted to show Michele her (Gilman's) nipple rings or belly rings which Michele told Gilman she did not want to see; however, as I recall Gilman showed them to Michele anyway.

e. Michele also told me how Lisa Towle would get right in Michele's face and yell at her on numerous occasions.

8. Michele told me she informed the ladies mentioned in paragraph 7 above, words to that effect, that their comments were inappropriate, unwelcomed, and she wanted them to stop, however they continued to happen on at least a weekly basis.

9. Michele told me she attempted to informed Judge Cyr of Towle's inappropriate and unprofessional behavior in the courthouse and that his attitude was that Towle does her job and he didn't want to hear anything about it.

10. Michele told me she informed Judge Kelly she was in fear of her safety because of Towle's behavior and that Michele believed Towle would physically harm her given Towle had attempted to run two different women off the road on two different occasions.

11. Michele told me she informed Pam Kozlowski on numerous occasions about the sexual harassment she was subjected to, as described in paragraph 7 above. However, Michele told me Kozlowski advised her not to go any further with her complaint because "they won't believe you" and "it will only come back at you".

12. During much of the time after August 2009, Michele wanted to return to work. However, she wanted it to be a safe and healthy environment. As her goal was to return to work, I do not believe she had any intention of suing her employer in Court.

13. During some of the times since Michele left work in August, 2009, her medical providers removed her from work, and from attending investigation meetings, due to her medical/psychological conditions, which I understand were work related.

14. During the Howe interviews Michele told me she felt like she was the one being investigated and under attack. The following are some of the things she shared with me about those interviews:

   a. She did not feel the questions were general questions but rather questions in an attempt to put blame on Michele.

   b. She told me she felt like she was on trial and they were trying to find things to accuse her of instead of trying to get to the truth.

3

      c.      Michele told me she felt they were accusing her of conspiring with Tracy Ashe. She told me they made a comment something to the effect of "Well, we understand you had Tracy Ashe move in with you." Michele said she told them, "Yes, but that was twenty years ago" and for a very short time. She told me Howe was surprised by that answer as apparently Howe thought it was much more recent and would prove that Michele and Ashe were both trying to cause unjustified trouble for Towle.

      d.      Michele told me Howe had a copy of Ashe's complaint against Towle and that Howe said, "I don't know where you're coming up with this", referring to the car painting incident. When Michele told Howe that Howe did not have a complete copy of the complaint, instead of Howe being neutral and giving Michele the benefit of the doubt, Michele told me Howe became adamant she did have a complete copy of the Complaint and accused Michele of making up the painting incident. I could tell Michele was very upset about this. After the interview, Michele contacted the court where the complaint was filed and was able to get a complete copy which did contain the painting incident.

      e.      Michele stated Howe raised her voice at her.

15.    I observed that the interviews Michele had with Christine Howe were very hard on Michele. She had a hard time emotionally getting ready for the interviews. She wouldn't sleep well the night before. The expression of her face showed she was scared. She kept repeating the same things over and over again in an anxious manner to me on her way to the interviews and afterward. As the interviews progressed, Michele would say to me, "Maybe we shouldn't even do this", or "I think we should let it go" and then she would say, "No we can't let this go. We can't let them get away with this". It was very obvious the whole process was wearing her down.

16.     Michele was a very strong woman who kept her emotions to herself for the most part. She always had a sparkle in her eye for life and all that it offered. She saw beauty in so many things and loved life.

17.     However, with each interview in Plymouth, I watched a once strong woman become weak and fragile. Michele became more and more withdrawn with despair. She had a worried look on her face and in her eyes. The expressions of laughter and fun were shown less and less. It was obvious this was taking a major toll on her.

18.     I remember specifically during one of the interviews she was going to have to testify to Judge Kelly's role in the whole investigation and she did not want to have to bring him into it but she knew she had to tell the truth. During the lunch break, Michele was extremely upset and kept saying she didn't want to have to testify against Judge Kelly and how she was afraid of what would happen if she did. When she went back into the interview after the lunch break, I was expecting her to come out very shortly thereafter, but the interview went on for another 3-4 hours. When she did come out of the interview, I looked at her and she was physically exhausted and scared. On our ride home she just kept repeating to me, "I didn't want to mention Judge Kelly, I didn't want to mention Judge Kelly. I only did it because I had to."

19.     After that interview, Michele began not dressing for the day but instead staying in her PJ's and not wanting to go out in public for fear of seeing other people involved in the court or aware of what was going on in court. This was not like her. If I took her to the store she would coward to me for protection and constantly scan the store for people she knew so she could avoid them. Michele would cling to me for protection when she saw people related to the case.

5

20. On a Saturday in approximately October 2009, Michele and I went to the Courthouse so that she could check her emails and obtain her personal files, which I understood contained documentation about the sexual and other harassment she endured. The files were not there.

21. During that October 2009 visit to the Courthouse, she intended to pick up a pair of shoes (she had approximately four or five pair of shoes there), however, once we were there Michele decided not to take any of them with her. Michele left her personal belongings because it was always her intention to return to work.

22. Michele told me that during the Hurley investigation, that Paula Hurley badgered her, ridiculed her, and criticized everything she had to say. Michele felt that Hurley never gave her a chance and never attempted to help Michele.

23. Michele told me she felt Christine Howe seemed biased against her, was one-sided and always trying to find fault with Michele.

24. It is my opinion, based on what Michele shared with me, that neither Hurley or Howe gave Michele an opportunity to express herself and that they were looking for things to blame on Michele, instead of conducting an unbiased investigation.

25. Michele had started mental health counseling after she left work in mid-August 2009. Michele continued in counseling up through the time of her suicide.

26. Leading up to the time of Michele's suicide she was increasingly distressed about her last interview, to the point that her counselor indicated she could not attend. She became so frightened and scared she was trembling. After the last interview, and before the final interview was canceled by her doctor, Michele lay in the recliner in our living room and cowered in what I would describe as a protective position. She just kept saying, "I can't go. I can't go. Please

don't make me go. I just can't take it. I can't do it. I can't do it." She was petrified. I had never seen my wife like this. It was at this point I contacted Rose Culver and told her Michele would not be attending another interview. It was obvious Michele could not take any more and I needed to protect her from the emotional turmoil she was going through.

27.  I believe the tone and manner of the interviews is what caused Michele to become so distressed that she killed herself, as well as not having been allowed to return to work.

28.  One time I offered to write down on paper what happened to Michele when she would come home from work so that she could remember an incident while it was fresh in her mind. I would begin the note and she would finish it because it was quicker and easier for her and obviously she knew the detailed information of what transpired.

29.  Because Michele was not working she was feeling inadequate, that she was not contributing financially to the household. She told me on several occasions how her not contributing financially to our household expenses made her nervous. She also told me how afraid she was that she was going to lose her job and how were we going to be able to pay our bills. No matter how much I tried to console her, she still felt inadequate.

FURTHER AFFIANT SAYETH NOT

/s/ CHARLES E. WALKER
Charles E. Walker

STATE OF NEW HAMPSHIRE
COUNTY OF CARROLL

Personally appeared Charles E. Walker, on this 15th day of April 2013, and upon oath affirmed that the above facts are true and accurate to the best of his knowledge and belief, before me

/s/ MONA J. TARDIF
Notary Public
My commission expires: 05/09/2017

7