
Ex 16

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

*************************************

Estate of Michele M. Walker, Charles E. Walker, Administrator

VS               NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of the Courts and State of New Hampshire - NH Second Circuit Littleton District Division - Administrative Office of the Courts
*****************************************

DEPOSITION OF PAULA HURLEY

This deposition taken by agreement of counsel at the Office of the Attorney General, 33 Capitol Street, Concord, New Hampshire, on Friday, October 22, 2012, commencing at 1:05 PM.

Page 26

1  A  Retaliation is something where I presume you
2     are asking in the context of an employment
3     investigation?
4  Q  Correct.
5  A  Retaliation would be if somebody were to
6     report something and an action were to be
7     taken against the reporter.
8  Q  Would it be appropriate to -- well, is it ever
9     appropriate to retaliate against someone in
10    reporting what they believe to be harassment?
11 A  Never.
12 Q  And does that mean that if the investigation
13    is unfounded, that that necessarily means the
14    person's report was not in good faith?
15        MS. DEMPSEY: Objection as to form.
16    You can answer.
17 A  No.
18 Q  Now, your training to conduct investigations,
19    you said the best training was at the
20    insurance company, correct?
21 A  Uh-huh. That is where I was trained to do
22    investigations, not employment investigations,
23    personal injury investigations, but my

Page 27

1     interaction, my management training really
2     came through my experience working with a
3     large staff in Manchester.
4  Q  When you worked for the staff -- during the
5     time you worked with the staff in Manchester,
6     did you get any more training within the court
7     system for performing investigations?
8  A  Not technically. All of these seminars have
9     some aspect, some component of them that is
10    dealing with situations that present
11    themselves that are challenging, and to that
12    extent, yes.
13 Q  Can you just go through with me what a
14    thorough investigation looks like? You get
15    the complaint, and then what do you do?
16        MS. DEMPSEY: Objection as to form.
17    You can answer.
18 A  When you get the complaint, you make contact
19    with the individuals involved, and set up an
20    opportunity to meet with them, and then you
21    sit down and comfortably meet with them as
22    best you possibly can and have them relate to
23    you everything that they understand about the

Page 28

1     circumstances.
2  Q  And do you start with the complainant?
3  A  Usually.
4  Q  Do you review any written materials?
5  A  Sometimes.
6  Q  And do you meet with anyone other than those
7     directly involved in the complaint?
8  A  If there was a reason to, possibly, but not
9     necessarily.
10 Q  Would it be important to talk to people that
11    may corroborate the complainant's story about
12    the events?
13 A  Yes, it would.
14 Q  What about gathering documentation?
15 A  It would be important to gather documentation.
16 Q  Is there any particular policy at the AOC that
17    governs investigations?
18 A  Not that I know of. I mean there is the
19    personnel rules. I am not sure the personnel
20    rules have a section in it or not. If they
21    do, I am not familiar with it.
22 Q  Let me show you what we have marked as Brown
23    19. Tell me if you recognize what that

Page 29

1     document is.
2  A  This is the anti-discrimination policy.
3  Q  And does that deal with investigations at all?
4  A  Yes.
5  Q  But it probably doesn't tell you how to do an
6     investigation, correct?
7  A  Right.
8  Q  Now, when you were assigned the investigation
9     of the Michele Walker complaint, what were you
10    told?
11 A  I was told that Michele Walker had
12    communicated with Judge Kelly that she was in
13    fear for her personal safety because of a
14    woman, a colleague, who worked in the court
15    named Lisa Towle.
16 Q  And what did he tell you to do?
17 A  He asked me to go up and find out what was
18    going on.
19 Q  Did he give you any documentation?
20 A  He did not.
21 Q  Do you remember what day that was?
22 A  It was Thursday, the 13th of August.
23 Q  Do you remember what time of day it was?

Page 30

1  A  I believe it was later in the day.
2  Q  So he didn't give you any details on what it
3     was that Michele alleged?
4  A  No. He didn't give me any specifics. He just
5     simply said she was in fear, and he wanted me
6     to go up and find out what was going on.
7  Q  What day did you go up?
8  A  The following day, which was Friday.
9  Q  The 14th?
10 A  Yes.
11 Q  And did you call ahead to let Michele know you
12    were coming?
13 A  Yes, I did. On the 13th, I called her to let
14    her know that Judge Kelly had received her
15    communication and asked me to come speak with
16    her.
17 Q  You actually spoke with Michele?
18 A  Yes, I did.
19 Q  And what did she say to you?
20 A  She did not want to meet with me. She said
21    she was too busy. The docket was heavy, that
22    she had many other things planned, and that
23    she just simply wasn't available to do it, and

Page 31

1     I responded that I really don't have a choice
2     in the matter, that if she has any concerns
3     about that, she'll need to address them and
4     resolve them with Judge Kelly.
5           I believe she made a call to Judge
6     Kelly. He either called her, or she called
7     him, I am not sure which. I believe they
8     spoke, because he shortly after that called me
9     and asked me to get Pat Keniston to the court
10    to make sure there was adequate support that I
11    could get up there and talk to her.
12 Q  Did you let Michele know you were still
13    coming, and Pat would be there to cover?
14 A  Yes.
15 Q  On the 13th?
16 A  On the 13th.
17 Q  Are you sure about that?
18        MS. DEMPSEY: Objection as to form.
19    You can answer.
20 A  I believe so. Either I did or Judge Kelly
21    did. Maybe I did not make the telephone call,
22    but I believe, I either ascertained that he
23    had spoken to her, and it was resolved, or I

Page 32

1     made the telephone call. One or the other.
2  Q  What time did you arrive up to Littleton?
3  A  I think it was about 10:30.
4  Q  What did you do when you got there?
5  A  Michele greeted me in the hallway, and we have
6     known one another a long time. She embraced
7     me and asked if I wanted to have a tour of the
8     facility, which is lovely, and so I said, yes,
9     I would love to see it.
10 Q  One of those last old court rooms?
11 A  Yes.
12 Q  So then after the tour, what did you do?
13 A  After the tour, she said, let's meet down in a
14    private office down the hallway where we will
15    have a little bit more confidentiality and
16    privacy. I said, that is great. I followed
17    her down the hall.
18 Q  And by that time, Pat Keniston was there?
19 A  Pat Keniston was there when I arrived.
20 Q  And tell me about the meeting with Michele.
21 A  We were seated in a very large office which
22    had a couple of large easy chairs, right next
23    to each other, and I opened the meeting by

Page 33

1     saying, what is going on? I don't know
2     anybody here. Fill me in.
3  Q  Okay. What do you remember her telling you?
4  A  Everything that she told me from that meeting?
5  Q  Your recollection of it.
6  A  Okay. Well, she had some difficulty knowing
7     where to start the story, but she started by
8     explaining that she and Gina and Pam had --
9     met -- she, Gina, Pam had met with Judge Kelly
10    over a year previous, and I gathered from what
11    she had said that there had been some
12    communication problems. This meeting was
13    intended to address or resolve or put them to
14    bed, and she left that meeting feeling
15    reasonably good that things were on the right
16    track, and that things were under control.
17          And then I believe she said that as
18    the months ensued, she wasn't as happy with
19    the communication. It seemed to have started
20    deteriorating with Michele, and then she
21    related that she was out for a period of time
22    in the early part of 2009, caring for one of
23    her children, and that when she came back,

1  A    Yes.

2  Q    Did you know she had been disciplined for

3        dating someone that had a case in court?

4             MS. DEMPSEY:  Objection as to form.

5        You can answer.

6  A    I did not.

7  Q    And you didn't look up the stalking petitions?

8  A    I did not.

9  Q    You did not check with Clark, the maintenance

10       man, about the incident where Lisa came over

11       and was upset with Michele because she

12       couldn't talk to her that minute?

13 A    I did not.

14 Q    And without having all of that information,

15       you made a determination that you didn't think

16       it was reasonable for Michele to be afraid of

17       Lisa?

18 A    I did not think Lisa posed a credible threat

19       to her.

20 Q    But you believed that Michele was afraid of

21       her?

22 A    I did.

23 Q    And if someone is afraid of someone who is