
Ex 18

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

*****************************************

Estate of Michele M. Walker, Charles E. Walker,
Administrator

VS                    NO: 1:11-CV-421-PB

State of New Hampshire - Administrative Office of
the Courts and State of New Hampshire - NH Second
Circuit Littleton District Division -
Administrative Office of the Courts
*****************************************

DEPOSITION OF EDWIN W. KELLY

This deposition taken by agreement of counsel at the Office of the Attorney General, 33 Capitol Street, Concord, New Hampshire, on Wednesday, November 7, 2012, commencing at 8:52 A.M.

1 A    A dozen times, very rough estimate.

2 Q    And about what percentage have you found to be

3       founded complaints?

4 A    I would say 50 to 75 percent, again, rough

5       estimate, probably on the higher end.

6 Q    Do you know what the investigation process is

7       generally that is followed by your

8       investigators?

9           Do you know how they go about it?

10          MS. DEMPSEY: Objection as to form.

11 You can answer.

12 A    Only by observing from a distance though. I

13       don't know what -- I don't know what they do

14       to prepare for and that sort of thing.

15 Q    Would you think that all witnesses should be

16       talked to?

17          MS. DEMPSEY: Objection as to form.

18 You can answer.

19 A    That's a difficult question to answer. I

20       think I can certainly see circumstances where

21       there might be witnesses who are given to an

22       investigator that the investigator may think

23       are not relevant to the investigation itself.

Page 46

1  Q  Now, if Michele Walker had any problems
2     talking to the investigator, was she supposed
3     to be able to come to you?
4            MS. DEMPSEY:  Paula Hurley?
5            MS. JOHNSON:  Right.
6  A  I wouldn't say so necessarily, no.  The way
7     the investigation that we use is structured,
8     is that an investigator goes out and speaks
9     with the person.  I have never had, that I can
10    think of, I cannot remember any time that
11    anyone has said that they are having trouble
12    speaking with an investigator that would have
13    changed the investigators.
14 Q  But you do remember Michele wanted to speak to
15    you personally?
16 A  Yes, I do.
17 Q  You told her to talk to Paula?
18 A  That is right.
19 Q  Under your harassment policy, if a mandatory
20    reporter is told of anything with respect to
21    sexual harassment, they are supposed to report
22    it, whether or not the person wants it
23    reported, right?

Page 47

1  A  Yes.
2  Q  And someone that doesn't do that, doesn't
3     report a complaint made to them, could be in
4     trouble themselves?
5  A  Theoretically, yes.
6  Q  Well, it would be contrary to policy, right?
7  A  Yes.
8  Q  Was Michele required to participate in the
9     investigation by Ms. Hurley by court rules?
10 A  I would have to look through the court rules.
11    My expectation is that we expect that
12    employees, when they are involved in any sort
13    of a personnel issue, will respond to the
14    inquiries made by their supervisors.
15 Q  Otherwise, it could be insubordinate, right?
16 A  Potentially.
17 Q  You would expect their participation with
18    respect to both the Paula Hurley investigation
19    and the Christine Howe investigation, correct?
20 A  Yes.
21        MS. DEMPSEY:  Objection as to form.
22    You can answer.
23 A  Yes.

Page 48

1          (Whereupon, the court reporter
2     marked Exhibit Number 4, Series of e-mails
3     from Walker to Kelly, 8-18-09, for
4     Identification.)
5  A  Okay.
6  Q  This is an e-mail chain between you and
7     Michele, correct?
8  A  Yes.
9  Q  And her last e-mail to you says she is right
10    out straight today and has a very busy court
11    day, and she has to stay focused on the work,
12    correct?
13 A  Yes.
14 Q  Are you aware of whether that is a court day?
15 A  No.
16 Q  Had you sent anyone else there to help on
17    August 18?
18 A  I don't recall if we did on that day.  I know
19    that we did, but I think that might have been
20    on the first day.
21 Q  Did you ever find out what the very important
22    and concerning information she wanted to share
23    only with you?

Page 49

1  A  I can't say that I did.  She did not share it
2     with Paula.  I did receive a letter that you
3     referred to earlier in November sometime.  I
4     don't know if that was the information.
5  Q  Let me show you the November letter.  Let's
6     mark that, easier than going back and forth
7     between exhibits.
8          (Whereupon, the court reporter
9     marked Exhibit Number 5, Letter to Hurley from
10    Walker, 11-9-09, for Identification.)
11 Q  You are familiar with the November 9th, 2009
12    letter?
13 A  Yes, I am.
14 Q  I guess this was sent to Paula as the
15    investigator, and she shared it with you?
16 A  I think that is right.
17 Q  So what steps did you take when you received
18    this letter?
19 A  I believe this letter was considered a
20    complaint under the anti-discrimination
21    policy, and it was forwarded to Jeff Smith,
22    pertaining to the anti-discrimination policy.
23 Q  Do you know what steps he took then?

Page 86

1    is the 24-page document that you have seen
2    before that you referenced earlier?
3  A  The 24-page document that I referenced before
4    begins a few pages in, and it is marked the
5    beginning of 104 and ending at 128.
6  Q  The first pages, have you seen those before?
7  A  I am not sure if I have. As I am reading it,
8    it looks as though it may be from the
9    transcript of her interview with Christine
10   Howe. If it is, then I have seen it, or some
11   parts of it.
12 Q  Okay. But it would be referenced in your
13   report if you saw this?
14 A  Yes, and --
15       MS. DEMPSEY: Objection as to form.
16   If you saw it. The question is, if you saw
17   it, it would be referenced in your report?
18 A  Yes, and anything that the investigator was
19   given that they discussed during their
20   interview, I would have had as well, and would
21   have reviewed that as part of the
22   decision-making process.
23 Q  And could you have listed those documents?

Page 87

1  A  I believe I did. I believe I was fairly
2    complete, although there may have been a
3    generalized statement about reviewing the
4    transcripts and any exhibits presented at the
5    time or something like that.
6  Q  Okay. Let me show you what has been marked as
7    Kozlowski 14, and it is a stalking petition by
8    Tracy Ash and ask you if you have seen that
9    before?
10 A  I have.
11 Q  Do you remember when you saw that first?
12 A  I don't recall when I saw it first.
13 Q  Sometime during the investigation?
14 A  I believe so. I may have also seen it when
15   the case was transferred, I believe, from
16   Littleton to Plymouth, and I may have seen it
17   in conjunction with the transfer of the case.
18 Q  And why would you have seen it at that point?
19 A  If a case is transferred from one court to
20   another, I will generally be involved in the
21   decision to transfer.
22 Q  Because it would -- what are the reasons cases
23   get transferred? Is there a whole bunch of

Page 88

1    them?
2  A  There are, but most of them from my
3    perspective have to do with any possible
4    appearance of impropriety that anyone looking
5    at the process from the outside would
6    perceive. Either that because the person
7    works in the court, the judge is more likely
8    to find in their favor, or the process would
9    appear to be unfair if the person is in the
10   same place or the litigants are in the same
11   place where the records are kept.
12 Q  Do you recall reviewing that at the time it
13   transferred?
14 A  I don't.
15 Q  Is it something you would have looked at to
16   see what the nature of it was?
17 A  Not necessarily. Sometimes it would be as
18   simple as a phone call saying that a civil
19   stalking petition has been filed against one
20   of the employees, and it is scheduled for
21   trial, should we move it? And I would say,
22   yes or no without seeing that petition.
23 Q  Wouldn't it be -- isn't it an unusual

Page 89

1    circumstance to have a stalking petition filed
2    against one of the court clerks?
3  A  Given that we have 350 employees, it is
4    unusual. It is rare, but it does happen.
5  Q  When Michele originally complained in August,
6    you didn't instruct Ms. Hurley about reviewing
7    the stalking petition or the court files in
8    any way?
9  A  I did not.
10 Q  Do you think knowing that there was a finding
11   about Lisa Towle actually stalking someone on
12   one occasion would be something that Paula
13   should look at?
14       MS. DEMPSEY: Objection as to form.
15   You can answer.
16 A  Not necessarily.
17 Q  If it was part of the complaint by Michele,
18   was it something that Paula should have looked
19   at?
20 A  If Michele was alleging that she was
21   specifically fearful because of that
22   complaint?
23 Q  In part?

```
 1        different court, correct?
 2                MS. DEMPSEY:  Objection as to form.
 3        You can answer.
 4   A    I think that is right, yes.
 5   Q    And then he left voluntarily and found another
 6        job, right?
 7   A    Yes, I don't know what happened beyond that.
 8   Q    You don't have any information that he was
 9        terminated?
10   A    Oh, no, I don't believe he was terminated.
11   Q    Did Michele Walker ever complain to you about
12        Chuck, about the plan to reassign Chuck?
13   A    I don't remember any complaint that Michele
14        made.
15   Q    I will show you this e-mail that was marked as
16        4 Knapp?
17   A    Okay.
18   Q    Do you recall receiving this e-mail?
19   A    I do.
20   Q    Do you remember when?
21   A    I think it was part of what I reviewed in my
22        decision.
23   Q    Do you know what Clark's last name is?
```